IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 119,745

In the Interest of P.R.,
A Minor Child.

SYLLABUS BY THE COURT

1.

Appellate courts have recognized three statutory methods by which parental rights are terminated: (a) adoption, (b) involuntary termination of parental rights, and (c) voluntary relinquishment of parental rights.

2.

Adoption, involuntary termination of parental rights, or voluntary relinquishment of parental rights each effects a complete and final divestment of all legal rights, privileges, duties, and obligations of the parent. The loss of parental rights is complete and includes the termination of the right to inherit from or through the child and the right to notice of and consent to subsequent adoption.

3.

A parent's right to make decisions regarding the care, custody, and control of his or her child is a fundamental and safely guarded liberty interest protected by the Fourteenth Amendment to the United States Constitution. This principle is beyond dispute.

**4.**

The fundamental right to parent is not however without limits. The welfare of children is a matter of state concern. The State's interest may be addressed by processes designed to protect children in need of care.

**5.**

The provision of the revised Kansas Code for Care of Children regarding relinquishment of parental rights to the Department for Children and Families (DCF), K.S.A. 2019 Supp. 38-2268(b), does not require that DCF accept the relinquishment in writing for the relinquishment to be effective.

**6.**

To be effective, a parent's relinquishment of parental rights must be knowing and voluntary. A knowing relinquishment is one given by a parent who has been fully advised of his or her rights and the consequences of the act of relinquishment.

**7.**

A parent who has knowingly and voluntarily relinquished his or her parental rights is not entitled to the additional procedural safeguard of an evidentiary hearing for termination of parental rights.

Review of the judgment of the Court of Appeals in an unpublished opinion filed May 31, 2019. Appeal from Shawnee District Court; STEVEN R. EBBERTS, judge. Opinion filed February 12, 2021. Affirmed.

*Rachel I. Hockenbarger,* of Topeka, was on the briefs for appellant natural mother.

*Morgan L. Hall,* deputy district attorney, was on the briefs for appellee State of Kansas.

*Jennifer Martin Smith,* of Alderson, Alderson, Conklin, Crow & Slinkard, L.L.C., of Topeka, and *Samantha R. Harrington*, of Topeka, were on the briefs for appellees adoptive parents.

The opinion of the court was delivered by

WARD, J.: We hold in this case that formal written acceptance by the Kansas Department for Children and Families (DCF) is not required in order for a parent's relinquishment of parental rights to that agency to be valid. We find under the facts of this case that the mother's relinquishment of parental rights to DCF was valid, knowingly made, and effective to terminate her parental rights. And we agree that mother was afforded the procedural due process to which she was entitled.

### HISTORY OF THE CHILD IN NEED OF CARE CASE

*Proceedings in District Court*

On March 30, 2015, the State filed a petition alleging that P.R., a child less than one year old at the time, was a child in need of care. The grounds asserted in the petition were lack of adequate parental care or control, as well as abuse or neglect. K.S.A. 2019 Supp. 38-2202(d)(1)-(3). The petition alleged that the child's mother T.R. had been smoking marijuana in a motel room with P.R. present, left him there unattended for a period of time, and locked herself out of the motel room at some point with P.R. inside. T.R. admitted to law enforcement officers she had smoked methamphetamine several days earlier and was struggling to give up her drug habit. The petition further alleged that T.R. was receiving services from DCF under a Drug Endangered Children case management program, that she was on probation in Shawnee County for domestic battery, that she had prior convictions for possession of methamphetamine and drug paraphernalia, and that she was bi-polar but not receiving mental health services.

3

That same day the court held a temporary custody hearing. T.R. appeared in person without counsel. P.R. appeared by his guardian ad litem (GAL). Based on the contents of the petition, the court placed P.R. in the temporary custody of DCF after making findings of an emergency and the necessity for out-of-home placement.

On April 27, 2015, the case came on for adjudication. T.R. appeared with her attorney. P.R. appeared by his GAL. One of the two putative fathers named in the petition did not appear. According to the journal entry from that hearing, "the guardian ad litem and mother of the child did submit to the Court a stipulation or statement of no contest to the petition . . . . Upon inquiry the Court finds that it is knowingly and voluntarily offered and that there is a factual basis and accepts it." The court found P.R. to be a child in need of care based on the grounds alleged in the petition.

At the dispositional hearing held on July 20, 2015, T.R. was not present, but her attorney was present. P.R. appeared by his GAL. The court found that DCF or its contractor continued to make reasonable efforts toward the permanency goal of reintegration with the mother. Temporary DCF custody of P.R. with out-of-home placement continued.

On February 8, 2016, the court conducted a permanency hearing "to determine progress being made to achieve the current permanency plan goal(s) of reintegration." T.R. appeared in person and with her attorney. P.R. appeared by his GAL. Putative fathers did not appear. The district court found: the progress of the mother toward reintegration was adequate; P.R.'s needs were being met; and reintegration with the mother remained a viable goal. Previous orders of temporary DCF custody and out-of-home placement continued in effect. Another permanency hearing was scheduled for January 16, 2017.

4

In November 2016, the foster father filed a motion for interested party status on behalf of himself and his wife. He then filed an amended motion for interested party status on January 5, 2017. This motion asserted that P.R. had lived with the foster parents since March 30, 2015, when he was five weeks old, and that he had bonded with them during the 21 months he had been in their care.

On January 18, 2017, the State filed a motion pursuant to K.S.A. 2019 Supp. 38-2266(a) for a finding of unfitness and termination of parental rights or alternatively the appointment of a permanent custodian. The State's motion alleged a failure by the mother to make progress toward reintegration. It further alleged multiple positive urinalysis (UA) results, failure to appear for multiple UA appointments, lack of employment, inability to care for P.R., and other grounds. The motion noted the continuing absence of a known father and asserted that P.R. had been thriving in his foster home placement. Also, on January 18, 2017, P.R.'s maternal aunt and uncle filed a motion for interested party status.

That same date the court conducted its next permanency hearing in the case. T.R. was present with her counsel. The court noted that T.R. and her counsel had been served with the State's termination motion. P.R. appeared by his GAL. T.R. named two additional putative fathers during this hearing, but no putative father appeared. The court found that T.R.'s progress toward reintegration with P.R. was inadequate and that reintegration was no longer viable. The court found that adoption would be in P.R.'s best interests. The case plan goal was changed from reintegration to adoption. The foster parents' motion for interested party status was granted. The maternal aunt and uncle's motion for interested party status was not addressed at that time.

On March 30, 2017, two years to the day after P.R.'s removal from his mother's home, T.R. executed a written relinquishment of P.R. to the agency (DCF). T.R. signed the relinquishment form before a notary public. T.R.'s attorney approved the form and

certified she fully explained to T.R. that "[T.R.] is permanently giving up all parental rights to the child and that [T.R.] has stated that such is her intention and desire."

The relinquishment form began with the following statement:

"NOTICE TO PARENT OR PERSON IN LOCO PARENTIS: This is an important legal document and by signing it you are permanently giving up all custody and other parental rights to the child named herein. You are to receive a copy of this document."

The relinquishment form recited biographical information about T.R. and P.R. It concluded with the following statements by T.R.:

"5. I do hereby relinquish the child to the Kansas Department of Children and Families, which I understand will have full power and all the rights of a legal guardian over the child, including the power to place the child for adoption and give consent thereto.

"6. I understand that by signing this relinquishment I do permanently give up all custody and other parental rights I have to such child, including the right to receive notice of any subsequent adoption proceedings involving the child. Understanding this, I wish to sign this relinquishment.

"7. At the time of signing this document, I am not under the care of a psychiatrist or other medical practitioner for any mental condition that would render me unable to make sound decisions, nor am I presently taking any medication or under the influence of any drug including alcohol that would impair my ability to understand or comprehend the significance or import or my relinquishment of the child identified above. I have been promised nothing in return for my relinquishment.

"8. I have read and understand the above and I am signing it as my free and voluntary act. Dated this 3/30/17 at 2:41 p.m."

On October 2, 2017, the court conducted a pretrial hearing on the termination of parental rights motion the State had filed in January. T.R. appeared with counsel. P.R. appeared by his GAL. The putative fathers appeared by counsel only. The foster parents appeared with counsel. The maternal aunt and uncle, who by this point had also been granted interested party status, appeared with their counsel. T.R. expressed her willingness to consent to a custodianship for P.R., but the State objected and urged the court to proceed with termination and the permanency of adoption. Trial on the termination motion was accordingly scheduled for January 16-17, 2018.

On January 8, 2018, just over a week prior to the trial at which the State would be asking the court to terminate the parental rights of T.R. and all putative fathers, the relinquishment form executed by T.R. on March 30, 2017, was filed in the record. It contained the signatures of T.R., her attorney Kathryn Gonzales, and it was notarized. The portion of the form showing acceptance of the relinquishment by DCF was not signed. However, an email from DCF's counsel which is included in the record indicates that DCF would accept T.R.'s relinquishment but, "a PRT trial was pending on father so we would not have accepted earlier."

On January 16, 2018, the termination of parental rights trial proceeded as scheduled. The State appeared by deputy district attorney Morgan Hall. The named and unknown putative fathers appeared by counsel, but none appeared in person. T.R. appeared with Gonzales. The court began the hearing by addressing T.R. and her counsel.

"The Court: So, the first issue is one of the permanency motion. Ms. Gonzales, your client has submitted a relinquishment, is that correct?

"Ms. Gonzales: That's correct, your honor."

Later in the hearing the following additional discussion occurred.

7

"The Court: Ms. Gonzales, anything else on behalf of your client?

"Ms. Gonzales: Your honor, we have no basis for which to object as to any unknown fathers. As far as the default.

"The Court: And her relinquishment stands.

"Ms. Gonzales: Yes. Ms. Hall and I double-checked with DCF last week, I believe it was.

"The Court: Very good.

"Ms. Gonzales: And, they said they're gonna accept it."

The district court then addressed termination of the parental rights of all putative fathers. The State noted that publication service was complete as to all unknown fathers. The State made a proffer of evidence as to the unfitness of any putative fathers. No one at the hearing, including T.R. and her counsel, objected to the court entering a default order terminating the parental rights of the putative fathers.

At a later point in the hearing the court stated:

"When you combine the unfitness finding the Court has just now made along with the relinquishment that's been provided by the mother, the court finds the evidence supports a termination of those fathers' parental rights. And, that it is in the best interests of this child when considering the physical, mental, emotional health of the child termination of parental rights is in the best interest[s] of the child.

"The best interests of the child would best be served by termination of the parental rights. Therefore, the Court terminates the parental rights of all fathers who are named here on the record today. And, along with the relinquishment, excuse me, the Court grants the agency the authority to consent to adoption.

8

"So, [T.R.] is now excused. Ms. Gonzales, you are excused. And, all of the attorneys representing those fathers are excused. I thank you all for your assistance and participation and wish you the best on behalf of [T.R.]."

Having confirmed T.R.'s relinquishment of parental rights, and having terminated the parental rights of all possible fathers, the court then turned its attention to permanency planning for P.R. The foster parents and the maternal aunt and uncle were present with their counsel. Although the court initially granted DCF the authority to consent to P.R.'s adoption, that authority was withdrawn later in the hearing when the court was told that the foster parents were seeking to proceed with a private adoption. Accordingly, P.R. remained in temporary DCF custody and in the care of the foster parents pending further orders. Two different journal entries memorializing this hearing would be filed several months later.

On May 22-23, 2018, the district court heard a motion by the foster parents for an order relieving DCF of P.R.'s custody, placing him directly into their legal custody, and allowing them to proceed with his adoption. The judge heard testimony from various witnesses, including expert testimony regarding the bond that P.R. had formed with the foster parents and the harm that would likely come to him by terminating his relationship with the two people he considered to be his parents. T.R. appeared at the hearing without counsel and was excused by the court given her earlier parental rights relinquishment.

The court found that DCF's efforts to remove P.R. from the foster parents' home in favor of the maternal aunt and uncle was an abuse of the agency's discretion because it failed to properly consider whether such placement would actually be in P.R.'s best interests, citing *In re J.A.*, 30 Kan. App. 2d 416, 421, 42 P.3d 215 (2002). The court concluded that the child's best interests were served by granting custody to the foster parents to pursue adoption. The court directed that P.R. be removed from DCF custody

9

and placed directly into the foster parents' custody. A written order to that effect was filed June 1, 2018.

On June 11, 2018, the maternal aunt and uncle filed both a motion for reconsideration of the court's June 1 order as well as motion for visitation with P.R. The aunt and uncle contended that T.R. had relinquished her parental rights specifically and only to DCF, and because the court relieved DCF of P.R.'s custody in its June 1 order, T.R.'s relinquishment was no longer valid. The aunt and uncle asserted that T.R.'s parental rights remained intact.

On June 19, 2018, the district judge entered an order denying the motion for reconsideration. The order noted that the aunt and uncle's motion was the first time anyone had argued that T.R.'s relinquishment of parental rights was invalid. The court questioned whether the aunt and uncle had standing to make this argument on T.R.'s behalf. In any event, the court determined that the motion lacked merit and found that T.R.'s relinquishment of her parental rights was voluntary, permanent, unconditional, and valid.

The following day on June 20, 2018, the foster parents filed their petition to adopt. On June 25, 2018, the district court filed its consent to the adoption of P.R. by the foster parents, noting the court's previous direct placement of P.R. with them, and citing K.S.A. 2019 Supp. 38-2270(a)(2) and K.S.A. 2019 Supp. 59-2129(a)(4) as authority for the court's adoption consent. The court's order read in pertinent part:

> "The Court does hereby consent to the adoption of [P.R.] by [foster father] and [foster mother], residents of Topeka, Shawnee County, Kansas and does hereby surrender said child to said persons for the purpose of adoption."

10

On July 15, 2018, T.R. filed a motion for relief from the January 16, 2018 parental rights termination order which had just been filed on July 5, 2018. She asserted for the first time that her relinquishment of parental rights was conditioned upon DCF's acceptance which she argued was required by K.S.A. 2019 Supp. 38-2268(b)(1). Absent that formal acceptance, she argued her parental rights were never terminated and remained intact. She challenged the district court's grant of custody to the foster parents as well as the court's consent to their adoption of P.R. She sought a stay of the adoption proceeding and modification of the July 5, 2018 journal entry to reflect that her parental rights were never relinquished.

On July 26, 2018, the district court assented to T.R.'s motion for relief and entered an order finding that despite T.R.'s knowing and voluntary relinquishment, there had never been an adjudication of her unfitness or a termination of her parental rights. The court rescinded its earlier order filed July 5, 2018, insofar as it applied to T.R., and put the State's termination motion back on the docket for adjudication. The court also stayed its earlier consent to P.R.'s adoption.

Following this order, the parties filed various motions and responses. On September 18, 2018, the district court conducted a status hearing. The court and counsel discussed the pending motions as well as the status of T.R.'s appeal which she had filed on July 18, 2018. The district court declined at that time to rule on these recent motions, instead staying their consideration until the appeal was resolved.

However, on October 9, 2018, the district court reversed course and entered an order in which it concluded that its July 26, 2018 order had been improvidently granted. The new order stated, "Mother's voluntary relinquishment under K.S.A. 38-2268 was a proper, legally authorized adjudication of Mother's parental rights and it is not necessary to conduct further proceedings to terminate her Mother's parental rights." The court reinstated its July 5, 2018 findings and order.

*Court of Appeals Decision*

The panel affirmed the district court, finding that K.S.A. 2019 Supp. 38-2268(b) did not require written acceptance of the relinquishment by DCF to be effective. The panel found: T.R.'s relinquishment of parental rights was knowingly made; T.R. was fully informed that she was giving up all custody and other parental rights; and the termination of her parental rights was based upon the district court's acceptance of her relinquishment compliant with all procedural safeguards, not based upon any finding of unfitness. *In re P.R.*, No. 119,745, 2019 WL 2306763, at *6 (Kan. App. 2019) (unpublished opinion).

DISCUSSION

Appellate jurisdiction here derives from K.S.A. 20-3018(b) and K.S.A. 60-2101(b) both of which authorize Kansas Supreme Court review of the final decisions of the Court of Appeals. In her petition for review T.R. enumerates seven different issues. Certain of T.R.'s issues are closely related and will be discussed together. Several of the issues were not properly preserved for review and will not be discussed in any detail.

*Parental Rights Termination Generally*

This court has noted in the context of child in need of care proceedings that voluntary relinquishment of parental rights is one of three statutory methods by which a parent's rights to his or her child may be terminated. The others are adoption and involuntary termination of parental rights. *State ex rel. Secretary of SRS v. Clear*, 248 Kan. 109, 116, 804 P.2d 961 (1991); *State ex rel. Secretary of SRS v. Bohrer,* 286 Kan. 898, 906, 189 P.3d 1157 (2008).

Under any of these processes the outcome for parent and child is the same. In *Clear* (a child in need of care [CINC] case involving mother's voluntary relinquishment of parental rights) the court stated, "A person whose parental rights have been relinquished through adoption, through a voluntary termination of parental rights, or through an involuntary severance of parental rights is no longer a parent. These statutory procedures contemplate a complete severance of the child's ties and relationship with his or her natural parents." 248 Kan. 109, Syl. ¶ 5.

In *Bohrer* (a CINC case involving a father's consent to permanent guardianship for his daughter) the court reiterated the finality of parental rights termination. The court stressed the point that adoption, relinquishment, and involuntary termination all effect "'a complete and final divestment of all legal rights, privileges, duties, and obligations of the parent and child with respect to each other.'" 286 Kan. at 914 (quoting *Clear*, 248 Kan. at 115).

And the revised Kansas Code for Care of Children (KCCC) itself provides that when a parent has relinquished a child to the agency, "all the rights of the parent shall be terminated, including the right to receive notice in a subsequent adoption proceeding involving the child." K.S.A. 2019 Supp. 38-2268(b)(4). The one exception to termination following relinquishment is when a parent relinquishes parental rights with the belief that the other parent will also relinquish or be found unfit by the court, and neither circumstance occurs. K.S.A. 2019 Supp. 38-2268(b)(5). In that case, relinquishment does not amount to a termination of parental rights.

*DCF's acceptance of T.R.'s relinquishment was not required.*

T.R. asserts that her relinquishment of parental rights was invalid because DCF never signed the part of the relinquishment form showing the agency's acceptance of P.R. She construes K.S.A. 2019 Supp. 38-2268(b)(1) as requiring DCF's written acceptance of

a child for the parent's relinquishment to be valid. The part of the form she refers to is titled "ACCEPTANCE OF CHILD BY AGENCY" and states, "I, the undersigned, on behalf of the Kansas Department [for] Children and Families, do hereby accept custody of [P.R.], the above relinquished minor child."

K.S.A. 2019 Supp. 38-2268(b) reads as follows:

"(1) Any parent or parents may relinquish a child to the secretary, *and if the secretary accepts the relinquishment in writing*, the secretary shall stand in loco parentis to the child and shall have and possess over the child all rights of a parent, including the power to place the child for adoption and give consent thereto.

"(2) All relinquishments to the secretary shall be in writing, in substantial conformity with the form for relinquishment contained in the appendix of forms following K.S.A. 59-2143, and amendments thereto, and shall be executed by either parent of the child.

"(3) The relinquishment shall be in writing and shall be acknowledged before a judge of a court of record or before an officer authorized by law to take acknowledgments. If the relinquishment is acknowledged before a judge of a court of record, it shall be the duty of the court to advise the relinquishing parent of the consequences of the relinquishment.

"(4) Except as otherwise provided, in all cases where a parent has relinquished a child to the agency pursuant to K.S.A. 59-2111 through K.S.A. 59-2143, and amendments thereto, all the rights of the parent shall be terminated, including the right to receive notice in a subsequent adoption proceeding involving the child. Upon such relinquishment, all the rights of the parents to such child, including such parent's right to inherit from or through such child, shall cease.

14

"(5) If a parent has relinquished a child to the secretary based on the belief that the child's other parent would relinquish the child to the secretary or would be found unfit, and this does not occur, the right of the parent who has relinquished shall not be terminated.

"(6) A parent's relinquishment of a child shall not terminate the right of the child to inherit from or through the parent." (Emphasis added.)

Interpretation of a statute is a question of law over which this court has unlimited review. *State v. Bryant*, 310 Kan. 920, 921, 453 P.3d 279 (2019). The standards governing statutory interpretation are well established:

"When interpreting a statute, a court first attempts to discern legislative intent through the statutory language, giving common words their ordinary meanings. When the language is plain and unambiguous, the court must give effect to its express language, rather than determine what the law should be. The court will not speculate about legislative intent and will not read the statute to add something not readily found in it. It is only when the statute's language is unclear or ambiguous that the court employs the canons of statutory construction, consults legislative history, or considers other background information to ascertain its meaning. [Citations omitted.]" *Nauheim v. City of Topeka*, 309 Kan. 145, 149-50, 432 P.3d 647 (2019).

T.R. contends that the Court of Appeals erred in applying a liberal construction to K.S.A. 2019 Supp. 38-2268(b) rather than strictly construing it to protect her right to parent, a fundamental right reiterated by the United States Supreme Court in *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). There the Court stated, "The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel*, 530 U.S. at 65.

15

This court has likewise said that the right to parent is a safely guarded liberty interest. Kansas courts have long held: "Virtually all jurisdictions including Kansas recognize the parents' rights of custody and control of their children are liberty interests protected by the Fourteenth Amendment Due Process Clause." *In re Cooper*, 230 Kan. 57, 64, 631 P.2d 632 (1981); see also *In re J.D.C.*, 284 Kan. 155, 166, 159 P.3d 974 (2007) ("A parent's right to make decisions regarding the care, custody, and control of his or her child is a fundamental liberty interest protected by the Fourteenth Amendment."). And very recently the Kansas Supreme Court reinforced the point that a parent's fundamental liberty interest in the right to make decisions regarding the care, custody, and control of their children is a principle "without dispute." *In re A.A.-F.*, 310 Kan. 125, 146, 444 P.3d 938 (2019).

The fundamental right to parent is not without limits. Child welfare is clearly a matter of state concern. *Sheppard v. Sheppard*, 230 Kan. 146, 152, 630 P.2d 1121 (1981), *cert. denied* 455 U.S. 919 (1982). And the interest of the State of Kansas in the welfare of children "may be asserted through state processes designed to protect children in need of care." *In re A.A.-F.*, 310 Kan. at 146.

T.R. correctly questions the panel's conclusion that "Kansas courts have never required strict compliance with the statutory provisions . . . of the CINC code." *In re P.R.*, 2019 WL 2306763, at *4. The panel's citation to *In re A.W.*, 241 Kan. 810, 816-17, 740 P.2d 82 (1987), does not support such a broad statement. Rather, when our courts have interpreted statutes affecting the right to parent, they have generally done so in a strict manner. "Statutes pertaining to adoption, relinquishment, or termination of parental rights are strictly construed as they all affect a parent's liberty interest in the custody and control of his or her children." *In re J.A.C.*, 22 Kan. App. 2d 96, Syl. ¶ 3, 911 P.2d 825 (1996). See also *In re Adoption of C.L.*, 308 Kan. 1268, 1279, 427 P.3d 951 (2018) (Adoption statutes are strictly construed in favor of natural parents' rights when consent to adoption is not required by reason of a parent's failure to fulfill parental obligations.).

But T.R. misconstrues the focus of the Court of Appeals analysis. The panel referred to the KCCC provision which states, "The code shall be *liberally construed to carry out the policies* of the state which are to:  Consider the safety and welfare of a child to be paramount in all proceedings under the code." (Emphasis added.) K.S.A. 2019 Supp. 38-2201(b)(1). But the policies behind the KCCC are not at issue here. Rather, the issue is simply how to construe K.S.A. 2019 Supp. 38-2268(b)(1), a provision which outlines the process for executing a relinquishment of parental rights.

The panel's interpretation of subsection K.S.A. 2019 Supp. 38-2268(b)(1) was, "Under this plain and unambiguous statutory language, an effective relinquishment of Mother's parental rights to the child is not predicated on a written acceptance by the secretary of DCF." The panel went on to say, "The secretary's failure to sign Mother's voluntary relinquishment form does not vitiate Mother's relinquishment of her rights to her child. Here, the issue is whether the district court can rely on the voluntary relinquishment signed by Mother." *In re P.R.*, 2019 WL 2306763, at *4.

We agree that under the plain language of subsection K.S.A. 2019 Supp. 38-2268(b)(1), DCF's written acceptance of the child is not required for an effective relinquishment of parental rights. The statute says "if" DCF accepts a parent's relinquishment, not that it must accept a parent's relinquishment. The statute clearly does not tie relinquishment efficacy to agency acceptance of the child. Nor does the statute say when DCF acceptance should take place if the agency does in fact accept the child for adoption purposes.

DCF's counsel explained in an email why the agency had not accepted P.R. The agency was prepared to do so but was waiting for termination of the parental rights of the known and unknown putative fathers to begin the adoption process. This is consistent with logic and with the statute because DCF is in no position to facilitate adoption of a child unless and until the rights of both parents have been terminated. DCF cannot

assume the role of in loco parentis when the rights of one or more of the child's natural parents remain intact.

Furthermore, pursuant to K.S.A. 2019 Supp. 38-2268(b)(6), T.R.'s relinquishment would not terminate her parental rights if it turned out the father's rights were not terminated. Permanency is a process in CINC cases whose outcome is not certain until it has finally occurred. Many outcomes are possible, including reintegration, voluntary relinquishment, involuntary termination, adoption, guardianship, etc. DCF must wait for the events involving both parents to run their course before proceeding with adoption.

The fact that DCF delayed its acceptance of P.R. did not however divest the agency of P.R.'s temporary and ongoing legal custody. P.R. was initially placed by the court into DCF's temporary legal custody on the day he was removed from his mother's care in March 2015. And he remained in DCF's legal custody until the day the court placed him with the foster parents at the conclusion of the May 2018 motion hearing. Contrary to T.R.'s assertion, P.R. was never without a legal custodian in this case.

Under K.S.A. 2019 Supp. 38-2268(b)(1), DCF's failure to sign the relinquishment form simply kept the agency from standing in loco parentis for P.R. (in the place of the parent) and having the authority to place him for adoption. The district court eventually did that itself pursuant to K.S.A. 2019 Supp. 38-2270 which provides that when parental rights have been terminated, and it appears that adoption is a viable alternative, the court shall either grant adoption authority to DCF (or other lawfully organized adoption agency) or grant custody of the child to proposed adoptive parents and consent to their adoption of the child. On June 1, 2018, the court filed its order placing P.R. directly with the foster parents, and on June 25, 2018, the court filed its written consent to P.R.'s adoption by the foster parents.

18

*T.R.'s relinquishment of parental rights was knowingly made.*

T.R. also asserts in her petition for review that "when she read and signed the Relinquishment of Minor Child to Agency she understood that she was relinquishing her parental rights to DCF for DCF to consent to the adoption of her child, and that said relinquishment *would become effective* upon DCF accepting her relinquishment in writing." (Emphasis added.) Because DCF never signed the relinquishment, and because the district court and not DCF placed P.R. for adoption, T.R. asserts her relinquishment was therefore not knowingly made.

This issue presents a mixed question of fact and law to which appellate courts apply a bifurcated standard of review. A district court's factual findings are examined to determine if they are supported by substantial competent evidence. Its conclusions of law are reviewed de novo. *In re Adoption of X.J.A.*, 284 Kan. 853, Syl. ¶ 8, 166 P.3d 396 (2007); *In re Guardianship of B.H.*, 309 Kan. 1097, 1107, 442 P.3d 457 (2019).

This court has said that a knowing relinquishment is one made by a parent who is fully advised of his or her rights and the consequences of the act of relinquishment. The trial court is in "the unique position of being able to render an impartial determination of the parent's true intent and desire and to protect the parent's rights." A relinquishment which follows a full advisory of rights and consequences, and which is voluntarily given, should be approved by the court. Conversely it should be rejected if it fails to meet those standards. *In re A.W.*, 241 Kan. at 816.

T.R. has never contended she did not know what she was doing on March 30, 2017, when she signed her relinquishment of P.R. The form itself would defeat that argument. Its language makes clear that T.R. was giving up "all custody and other parental rights" to her child, including "the right to receive notice of any subsequent adoption proceedings involving the child." And her attorney's signature and certificate on

19

the relinquishment form reinforces the point that T.R. was fully advised and aware that she was "permanently giving up all parental rights to the child" and "that such is her intention and desire."

Instead, she contends that the efficacy of her relinquishment was conditioned upon a future event (DCF's signature on the relinquishment form) that never occurred. She seems to argue that although her relinquishment was initially effective, it later became ineffective when the court and not DCF made the adoption placement decision for P.R.

But the KCCC makes no provision for a conditional relinquishment of parental rights, except when the relinquishment is made on the belief the other parent would relinquish and does not, or the other parent is not found unfit. K.S.A. 2019 Supp. 38-2268(b)(5). As noted above, the effect of voluntary relinquishment is a complete and final severance of the parent/child relationship. Although T.R. may have expected and anticipated that DCF would be making the adoption placement decision, she had to understand when she signed the relinquishment form that she was empowering someone or some entity other than her to make that decision.

T.R. knew as early as a hearing on October 2, 2017, that the State wanted the court to terminate parental rights so that P.R. could be adopted rather than simply having a guardian or custodian appointed for him. Knowing the State's position and knowing that DCF had not signed the relinquishment form indicating its acceptance of P.R., she nonetheless filed her relinquishment on January 8, 2018. She then confirmed at the January 16, 2018 hearing that the relinquishment was filed, and she was standing by it.

It was not until July 15, 2018, when she filed a motion for relief from the court's order of termination, that she contended her March 2017 relinquishment was invalid. Coincidentally or perhaps not, this was just several weeks after the foster parents had filed their petition to adopt P.R. and the court had filed its consent to that adoption.

20

T.R. may have assumed that P.R.'s aunt and uncle would be able to adopt him, but this assumption would not have made her relinquishment unknowing. As noted above, the court conducted an extensive evidentiary hearing to determine whether it was best for P.R. to be adopted by the foster parents or be adopted by the maternal aunt and uncle. The district court determined based on substantial competent evidence that P.R.'s best interests were served by placement with the only parents he had known since he was five weeks old and the people with whom he had developed a strong emotional bond.

As the Court of Appeals panel here noted, "The requirements of a knowingly made relinquishment of parental rights [do] not include a requirement that the relinquishing parent be fully informed of what will be the ultimate disposition of the case, i.e., the specific ultimate placement of the child thereafter." *In re P.R.*, 2019 WL 2306763, at *5. And as noted above, K.S.A. 2019 Supp. 38-2268(b)(1), (4) provide that the rights given up by a relinquishing parent include the right to consent to adoptive placement or even to be notified of later adoption proceedings.

There is substantial competent evidence in the record to support a finding that T.R.'s relinquishment of parental rights was voluntary, fully informed, and knowingly made. This includes the plain language of the relinquishment form itself, the certification of T.R.'s attorney regarding T.R.'s understanding of its effect, and the district court's confirmation with T.R. in open court that she stood by her relinquishment.

*The District Court Did Not Violate T.R.'s Due Process Rights.*

T.R. next argues that she was denied procedural due process when it ultimately came to the termination of her parental rights. She argues that because DCF never accepted her relinquishment in writing, her parental rights were never terminated by virtue of the relinquishment form. The district court should therefore have afforded her

the opportunity of an evidentiary hearing at which the State would have the burden of proving one or more of the statutory grounds for unfitness. We disagree.

T.R. was in fact present with counsel at the termination of parental rights trial conducted on January 16, 2018. She had every right to hold the State to its burden of proof. But she chose not to. Instead, she confirmed to the court that her voluntary relinquishment of parental rights form had been filed of record and that she stood by the same. At that point she was no longer a party to the proceeding. The hearing went forward as to the putative fathers because they had not been identified and had certainly not relinquished their rights. At some point during the hearing T.R. and her counsel were excused by the court from further appearances in P.R.'s CINC case.

This court has already determined that DCF written acceptance of a parent's relinquishment is not required under K.S.A. 2019 Supp. 38-2268(b). And this court has noted that a parent's voluntary relinquishment is one of the three statutory methods by which parental rights are terminated. See *Clear*, 248 Kan. 109, Syl. ¶ 5; *Bohrer*, 286 Kan. at 914. T.R.'s parental rights were terminated here not by any judicial finding of parental unfitness but by her own knowing and voluntary relinquishment.

Contrary to T.R.'s assertion, she was not denied the benefit of due process along the way. It is clear from the history of the CINC case detailed above that T.R. was afforded consistent procedural due process throughout the three plus years the case was pending in the district court from and after March 2015. She retained counsel shortly after her appearance at the initial temporary custody hearing. And the record reflects that T.R. appeared with or by her counsel at every scheduled hearing in the case until her relinquishment of parental rights was acknowledged by the district court in January 2018 and she was excused from the case.

As this court noted recently, "To establish a due process violation, Mother must show she was both entitled to and denied a specific procedural protection." *In re A.A.-F.*, 310 Kan. at 145. After T.R. relinquished her parental rights in this case she was not entitled to further notice of hearings or an opportunity to be heard. The KCCC makes that clear, and the district court made that clear to T.R. at the May 2018 motion hearing when she showed up without counsel.

T.R. was no more entitled to procedural due process following her relinquishment than a criminal defendant is entitled to a jury trial after entering a successful plea of guilty or nolo contendere. It is an either/or proposition, not both. Relinquishment is a statutory method of ending the parent/child relationship without requiring the State to prove a parent's unfitness. T.R. terminated her own parental rights voluntarily, and in doing so eliminated the necessity for a termination hearing or any further hearing as to her parental rights. T.R.'s claim that she was denied due process lacks merit.

*Remaining Issues Not Considered*

In her petition for review T.R. raises additional issues that will not be addressed by this court. T.R. asserts that her due process rights were violated by the district court at the January 2018 termination hearing when it granted an oral motion after she and her counsel had been excused from the hearing. She next argues that the trial court erred by rescinding DCF's authority to proceed with P.R.'s adoption. And she asserts lastly that the trial court erred by proceeding under K.S.A. 2019 Supp. 38-2270 after her relinquishment which she believes did not result in the termination of her parental rights.

With respect to cases on petition for review, this court's rules provide, "The Supreme Court will not consider issues not raised before the Court of Appeals . . . ." Supreme Court Rule 8.03(b)(6)(C)(i) (2020 Kan. S. Ct. R. 54). The court stressed the application of this rule by holding: "Any issue that was not presented to the Kansas

23

Court of Appeals is deemed abandoned." *State v. Ward*, 292 Kan. 541, Syl. ¶ 10, 256 P.3d 801 (2011). The Court of Appeals was not presented with and did not address any of these three issues. Nor shall we.

CONCLUSION

Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

MICHAEL E. WARD, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** Senior Judge Ward was appointed to hear case No. 119,745 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.