NOT DESIGNATED FOR PUBLICATION

No. 128,192

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of M.T., M.H., and J.H., Minor Children.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; GREGORY D. KEITH, judge. Submitted without oral argument. Opinion filed July 3, 2025. Affirmed.

*Laura E. Poschen*, of Law Office of Laura E. Poschen, of Wichita, for appellant natural mother.

*Kristi D. Allen*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before WARNER, C.J., ARNOLD-BURGER and BRUNS, JJ.

PER CURIAM:  Mother appeals the district court's termination of her parental rights to her three minor children. Finding no error, we affirm.

FACTUAL AND PROCEDURAL HISTORY

The facts are not in dispute. The following is derived from the record on appeal, including any hearings related to the case.

Mother has three children:  M.T. (born in 2014), M.H. (born in 2021), and J.H. (born in 2023). S.H. is the father of M.H. and J.H. Neither father is a part of this appeal.

This case began, for all practical purposes, when the family lived in Oklahoma. Mother had separated from her husband, M.T.'s father, and was living with S.H. and their child, M.H., as well M.T. The family came to the attention of state officials because M.H.—who has Down syndrome, as well as a congenital heart defect and hernia for which corrective surgery were performed—was failing to thrive because Mother was not feeding him enough, often forgetting to feed him at all. M.T. was apparently attending school and had an Individualized Education Plan (IEP). The children were not removed from the home at that time. But Mother was not compliant with case tasks.

Oklahoma officials reported that physical altercations and domestic violence between Mother and S.H. had been documented by Texas State Troopers. Mother was noted to be the aggressor. The family had lived at various times in Colorado, Oklahoma, and Texas. Comprehensive family services had been put in place, but before Mother had completed things such as a mental health assessment and anger management classes, Mother and S.H. moved to Kansas with the children. This was sometime around May 28, 2022. The Oklahoma Department of Human Services (DHS) had attempted an unannounced home visit in Oklahoma when they discovered the family had moved. They reported this to Kansas authorities.

Once in Kansas, the Kansas Department for Children and Families (DCF) officials got involved because of the report from DHS and M.H.'s continued failure to thrive. Just a few weeks after their arrival in Kansas, DCF conducted interviews with both Mother and M.T.

Mother was aware of M.H.'s medical issues but was unable to tell Kansas officials basic information about his treatment, including the name of M.H.'s pediatrician or his heart doctor who performed M.H.'s heart surgery just a few months earlier. M.T. reported that M.H. cries a lot and Mother is not good about remembering to feed M.H.

2

As to M.T., according to Mother, M.T. has attention deficit hyperactivity disorder but she did not want him to receive medicine for it. During the interview, M.T. asked a worker from the DCF what she does at her job, to which the worker replied that she "'helps kids and keeps kids safe.'" M.T. responded, "'I'm not safe.'" M.T.'s overall appearance was "dirty" and staff noted several scars, red marks, and bruising all over his body. He reported that the night before, Mother and S.H. had a physical altercation. He said his Mother was having a hard time breathing as she was lying on the ground and S.H. was standing over her. M.T. said he asked Mother what he should do and if he should grab M.H. and put him in his room to keep him safe. M.T. revealed that he did not feel safe at home because he was afraid S.H. would "hit him again." He reported that a few years earlier S.H. had hit him in the chest approximately three times and he couldn't breathe until Mother was able to get S.H. off of him. He reported S.H. also punched and kicked him in the stomach. As M.T. was relaying this information, Mother kept interrupting him and attempting to coach him.

Two days later, the district court entered an ex parte order of protective custody and the State filed a petition alleging M.T. and M.H. were children in need of care, asserting, essentially, that the children were not being adequately cared for by their parents due to abuse or neglect. Mother began receiving services from St. Francis Ministries (SFM) that same month to work toward developing the skills, experience, and knowledge necessary to properly care for her children.

In February 2023, Mother gave birth to her third child, J.H. J.H. was also placed in police protective custody and the State quickly filed a petition alleging J.H. was—like his siblings—a child in need of care on the same basis as his siblings.

It would be another year before a hearing was held on the State's motion to terminate Mother's parental rights to all three children. So by the time the hearing was

held J.H. was almost a year old, and M.T. and M.H. were nine and two respectively. The older two had been out of Mother's custody for approximately 20 months.

During those 20 months Mother completed all her case plan tasks. She completed a parenting class, an anger management class, and a domestic violence class. She demonstrated stable housing, and she consistently tested negative for drug use. However, she had not advanced beyond supervised visits with her children. This was due to her inability to apply what she learned from classes and case workers. These issues will be discussed in more detail below. Suffice it to say that the district court terminated her parental rights based on several statutory factors. She appeals that decision.

ANALYSIS

Kansas courts have long recognized that "parents who have assumed parental responsibilities have a fundamental right to raise their children that is protected by the United States Constitution and the Kansas Constitution." *In re Adoption of C.L.*, 308 Kan. 1268, 1279, 427 P.3d 951 (2018). Nevertheless, "[t]he fundamental right to parent is not without limits. Child welfare is clearly a matter of state concern." *In re P.R.*, 312 Kan. 767, 778, 480 P.3d 778 (2021). Because of this, a statutory framework is in place to make sure there is sufficient evidence to support such a permanent decision by the court.

As an overarching statutory safeguard, before any termination can take place, the court must find by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future. K.S.A. 38-2269(a). Such a finding is tethered by a nonexclusive list of statutory factors the court must consider in reaching its conclusion that the parent is unfit. Here, because the State petitioned the court to terminate Mother's parental rights, the State has the burden to establish Mother is unfit to care for her children and that her unfitness is unlikely to

4

change in the foreseeable future. K.S.A. 38-2269(a); *In re Adoption of B.B.M.*, 290 Kan. 236, 243, 224 P.3d 1168 (2010) (finding that the petitioner bears the burden of proving by clear and convincing evidence that termination of parental rights is appropriate).

In reviewing a district court's termination of parental rights, this court views all evidence in the light most favorable to the State to determine whether a rational fact-finder could have found it highly probable by clear and convincing evidence that parental rights should be terminated. In making this determination, this court does not "weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact." *In re Adoption of Baby Girl G.*, 311 Kan. 798, 806, 466 P.3d 1207 (2020).

So with that foundation explained, we proceed to the appellate claims made by Mother.

A.      *The evidence to support the court's finding of unfitness*

Kansas law enumerates nine nonexclusive factors the district court "shall consider" in "making a determination of unfitness." K.S.A. 38-2269(b). An additional four factors come into play when a child is not in the physical custody of the parent at the time of the determination. K.S.A. 38-2269(c). "The existence of any one of the . . . factors standing alone may, but does not necessarily, establish grounds for termination of parental rights." K.S.A. 38-2269(f). The district court listed five statutory factors to justify the termination of Mother's rights. We will examine each one for sufficiency of the evidence.

i.      *Physical, mental, or emotional abuse or neglect—K.S.A. 38-2269(b)(4)*

In considering whether a parent is unfit, the court must consider whether there has been physical, mental, or emotional abuse or neglect of their child. K.S.A. 38-2269(b)(4).

This case came to the attention of both the Oklahoma and Kansas authorities due to Mother's inability to properly care for M.H. But before arriving in Kansas, DHS had received several prior intakes regarding the family. M.H. was born with significant medical problems. He has Down syndrome, a congenital heart defect that required surgery at five months old, and a hernia in his chest that also required surgery. Oklahoma authorities became involved because M.H. was grossly underweight. Mother had reported to them that she sometimes forgets to feed him and sometimes he simply refuses to eat. She indicated that she was too busy dealing with M.T., who has attention deficit hyperactivity disorder, to feed M.H. She also forgot to increase the amount of formula she was giving him after being advised to do so by staff. Staff attempted to provide Mother with information about nutrition and family therapy.

DHS opened a substantiated case against Mother and S.H. for failure to provide nutrition to the children, threat of harm, and exposure to domestic violence. There was documentation that Mother had been abusive toward S.H. in the presence of both children. Mother was required to complete a mental health assessment, an anger management class, and a domestic violence class. S.H. had already relinquished his parental rights to a child from a previous relationship due to physical abuse. DHS began comprehensive in-home services for the children, with staff visiting the home twice a week for two hours at a time. Staff reported their concern for the safety of the children due to a history of physical abuse. Mother left Oklahoma with the children after approximately two months of in-home services without notifying DHS.

Upon arrival in Kansas, DCF, alerted by DHS, developed the same concerns. Mother indicated that she was not fond of the idea of accepting services from DHS in Oklahoma. Although M.H. was required to attend follow-up appointments from his surgery, Mother never scheduled any follow-up. Doctors and pediatric social workers who examined M.H. in Kansas indicated he was "'extremely malnourished'" and had a number of health issues for which he was not receiving needed medical attention. He

6

needed occupational therapy, physical therapy, speech therapy, a primary care physician, and an early intervention program. Mother needed to work with a nutritionist regarding M.H.'s diet. Mother reported at her first contact with DCF that she had recently taken M.H. to a Wichita clinic for shots, but he had only been given two shots instead of four. She also claimed that M.H. was losing weight because he did not like his new home.

Mother advised DCF staff that M.T. has attention deficit hyperactivity disorder but she did not want him to receive medicine for it. When he was taken, along with M.H., to Wesley Pediatrics, M.T. asked a worker from DCF what she does at her job, to which the worker replied that she "'helps kids and keeps kids safe.'" M.T. responded, "'I'm not safe.'" He reported that the night before, since arriving in Kansas, Mother and S.H. had a physical altercation. He said his Mother was having a hard time breathing as she was lying on the ground and S.H. was standing over her. M.T. said he asked Mother what he should do and if he should grab M.H. and put him in his room to keep him safe. M.T. revealed that he did not feel safe at home because he was afraid S.H. would "hit him again." He reported that a few years earlier S.H. had hit him in the chest approximately three times and he could not breathe until Mother was able to get S.H. off of him. He reported S.H. also punched and kicked him in the stomach. After being taken to the Wichita Children's Home, it was noted that his overall appearance was dirty and he had several scars, red marks, and bruising all over his body.

Physical violence against M.T. was confirmed through a conversation with Mother's cousin. He relayed an incident in which Mother called him when she was pregnant with M.H. and living in a hotel room. She stated that S.H. and M.T. were playing a video game, and M.T. messed up the game. S.H. kicked M.T. in the stomach. The cousin said he then talked to M.T. and M.T. confirmed the incident. He reported he has a good relationship with M.T. and is often able to calm him down. He reported that he trusts M.T. when M.T. tells him about abuse and not feeling safe.

In addition, Mother acknowledged that M.T. had witnessed her committing domestic violence against S.H. She believes witnessing the violence affected him emotionally.

Due to this abuse and neglect, M.T. and M.H. were taken into protective custody on June 15, 2022, and have not resided with their parents since. A guardian ad litem was appointed and approximately a month later the two children were adjudicated as children in need of care.

When their sibling was born about six months later, J.H. was removed from Mother's custody upon reports from the hospital that Mother could not care for her newborn baby. She required a lot of direction and did not appear to fully understand cues from the baby. Mother did not seem to understand the instructions she was given regarding care for the new baby. She was unable to provide feedings or diaper changes without being directed by nursing staff. Social workers at the hospital were concerned that Mother was not competent to take care of a newborn at the time. Mother was allowed weekly visits with the baby with hopes of eventual reintegration. But she struggled with interacting with three children at a time and becomes easily overwhelmed.

Safety concerns for M.H. became paramount in August 2023, over a year into this case when DCF had allowed unsupervised visits. Due to his Down syndrome with dysphagia, M.H. was required to have his formula thickened to properly digest. His physician wrote DCF and requested that M.H. not be left unsupervised with Mother due to concerns that she was not following medical advice regarding the thickened liquids. M.H. had to be hospitalized after a visit with Mother. He was seen due to congestion and raspiness, and he had to restart antibiotic therapy as a result. Mother had given him milk, causing him to aspirate and lead to an infection in his lungs. Visitation was moved to supervised and from Mother's home to the offices at SFM.

8

At about the same time, a SFM worker advised the SFM permanency specialist that M.T. was crying during visits due to "remembering something that happened in Oklahoma." He stated that he remembered getting hit with a belt if he did not eat all his food. Mother denied this was the reason M.T. was crying and seemed to ignore what he was saying. She did not help him calm down but instead deflected the situation to M.H. "'humping'" the ground, which was actually M.H. rocking, a common occurrence for children with Down syndrome. When that was pointed out to her, Mother responded that the case team was doing "'the devil's work.'" In addition, Mother was unaware of all of M.T.'s food allergies, and it was not believed she would know how to get help if he ingested something to which he was allergic. She is easily and often overwhelmed when things happen outside of a routine.

Mother continued to have great difficulty dealing with all three children at once, even in a supervised setting. She was never able to progress to overnight visits. She also stated that she does not want M.H., due to him not being "'normal.'" She was heard referring to M.H. as "'it.'" She further added that she only wanted J.H. if he was "'normal,'" not like M.H. Staff reported that Mother has struggled changing M.H.'s diaper, which has fallen off due to being too loose. They reported that Mother does not appear to understand M.H.'s dietary needs and gets confused about what he needs to be eating. Mother does not appear able to make his "thickened" liquids, even though she has been instructed several times. She does not keep the thickening packets in her home, so she could not use them during home visits. M.H.'s foster placement brings bottles premixed to visitations as a backup, but Mother is supposed to be able to demonstrate she can prepare them on her own. She failed at her only attempt because she did not bring a syringe to test the consistency of the liquid before feeding it to M.H. Because Mother refuses to use anything brought by placement, she simply does not feed him a bottle during visits. Sometimes, she will feed him yogurt which is acceptable.

This continued to be an issue at the termination hearing when this exchange took place between Mother and the guardian ad litem:

> "[Guardian ad litem:] . . . Can you explain to me what the process is for making these special bottles for [M.H.]?
> "[Mother:] She showed it twice, and you're supposed to either—some type of juice. You can use Juicy Juice. I was using, what, apple juice. And then you're supposed to mix it. And there was this—I don't know what that thing's called, that—I don't know what that word is. Guys, I really don't have it in front of me."

Mother testified she had only made the special bottle for M.H. once when someone from SFM was teaching her how to make it.

According to S.H., Mother's anger management issues have gotten better, but they are still present. He believes it happens when she becomes overwhelmed. According to case workers, Mother is easily and frequently overwhelmed. In fact, she consistently gets overwhelmed when she has all three children at the same time.

There were concerns for the safety of the children when they were taken into protective custody and Mother has done nothing to lead a rational decision maker to believe the children would be safe in her care today, any more than they would have been when first taken into custody. There is clear and convincing evidence to support the district court's decision to terminate Mother's parental rights based on this statutory factor.

ii.  *Lack of effort on the part of the parent—K.S.A. 38-2269(b)(8)*

Parents must show they have made an effort to do what is necessary to safely and appropriately parent their child. See K.S.A. 38-2269(b)(8). They must show that they are able to adjust their circumstances, conduct or condition to meet the needs of the child.

10

K.S.A. 38-2269(b)(8). The evidence is clear and convincing that Mother has failed to expend the effort necessary to care for her children.

The examples provided regarding Mother's failure to learn or failure to retain how to make a bottle that is essential for M.H.'s nutrition and her failure to take advantage when those bottles are provided for her, is one indication of a failure of a parent to do what is necessary to keep their child safe and regain custody. But there were others.

The strongest example is the condition of the home. From the very beginning of this case, the safety of the home for children was discussed with Mother. Many small items were on the floor easily accessible to a baby and clothing was in plastic bags strewn around the home. A half full baby bottle was located on the counter. The milk in it was the consistency of cottage cheese, even though Mother said M.H. had consumed it just two hours earlier. A small bruise was noticed on M.H.'s face, which Mother attributed to baby acne.

In October 2023, over a year into this case, the case manager conducted a home inspection that revealed the floors were dirty, which caused crawling children to have blackened hands and knees. There were bottles of laundry detergent, household cleaners, sunscreen, and shampoo lying on the floor in easy reach of children. The family's belongings were in trash bags throughout the house, which could have been easily crawled into by the children. Lots of tiny objects were on the floor that presented choking hazards. The one folding table the family had was not steady and could easily tumble if one of the babies learning to walk would attempt to pull himself up. Space heaters, although not plugged in, were throughout the home. Social workers assigned to the case offered to help get furniture for the home, put up baby gates, and help clean. Their offers were refused by Mother.

11

During a reinspection in November 2023, concerns were pointed out to Mother, and she was told to contact the case manager once the concerns were corrected for a second walk through. Although the case manager followed up several times, she was never requested to come out for a second walk through. Mother was aware that maintaining the home in a safe condition was necessary for her children to be returned to her, yet she failed to do what was necessary, including refusing free outside assistance, to make that happen. S.H. advised the court during his testimony at the hearing that they were aware of the concerns that needed to be corrected in relation to the safety of the home and they had not completed any of the tasks.

There is clear and convincing evidence to support the district court's decision to terminate Mother's parental rights based on this statutory factor.

iii.     *Failure of reasonable efforts to rehabilitate—K.S.A. 38-2269(b)(7)*

If the State is going to remove children from their parents, they must make reasonable efforts to rehabilitate the family. See K.S.A. 38-2269(b)(7). "'The purpose of the reasonable efforts requirement is to provide a parent the opportunity to succeed, but to do so the parent must exert some effort.'" *In re M.S.*, 56 Kan. App. 2d 1247, 1257, 447 P.3d 994 (2019). "Agencies must expend reasonable efforts toward reintegration but need not make 'a herculean effort to lead the parent through the responsibilities of the reintegration plan.'" *In re H.M.*, No. 124,961, 2022 WL 12121175, at *6 (Kan. App. 2022) (unpublished opinion).

There was no mystery about what Mother was required to do to obtain her children from state custody. She had to demonstrate that she had a safe place for them to live and that she could care for the mental and emotional needs of three children, two of which had special needs.

At the time of the hearing, Mother had an unrealistic view of what would be needed for reintegration, keeping in mind she had not even progressed to supervised visits, let alone overnight visits.

"Q. Have you ever struggled with any part of parenting during a visit?

"A. No.

"Q. If the Court were to give you more time, how much more time would you need?

"A. A couple of days.

"Q. A couple of days and you can achieve reintegration; is that correct?

"A. That, or we could try a week.

"Q. I'm sorry?

"A. That or we could try a week.

"Q. A week. A couple days to a week and you can achieve reintegration? What's—

"A. As long as I'm not pressured.

"Q. What do you mean by that?

"A. It means keep being asked to do something.

"Q. And if you were pressured, what would happen?

"A. Nothing. I just don't like it. It's not the routine I go by.

"Q. So if you are in a pressured situation, does that affect how you behave?

"A. No. It just bothers me because I'm not used to having people standing over me, telling me what to do. Nothing goes wrong with it.

"Q. You just don't like it?

"A. I just don't like it."

The State countered that reintegration would not be possible through the testimony of a supervisor from SFM:

"Q. In working with your case team since August of 2023, have you been able to come up with any viable option that would make reintegration possible?

"A. No. We talked a lot about continuing to try to coach parents, and it seems that they would—Mom would be more defiant in wanting us to help, and she would—we would try to get her to do things, and she just refused to do it. And I don't know if it

13

was because she didn't understand or if it—she just wasn't going to do it because she didn't want someone telling her how to raise her children.

. . . .

"Q. And you've indicated there's no other services that could have been provided. Is there any chance that any more—if more time were to be given to parents to work towards reintegration, that we would be in a different set of circumstances?

"A. I don't, because they've been given resources and been coached several times. We are not seeing them make secondary change, which is the change we need to see, is that they actually can apply the things that they have learned to be able to keep their children safe."

The supervisor ultimately recommended termination of Mother's parental rights.

We have no hesitancy concluding that offering further accommodations to Mother would have been futile given Mother's consistent refusal of additional assistance or services.

There is clear and convincing evidence to support the district court's decision to terminate Mother's parental rights based on this statutory factor.

  iv. *Failure to carry out a reasonable plan approved by the court—K.S.A. 38-2269(c)(3)*

When a child is not in the physical custody of their parent, the court must consider whether the parent has carried out a reasonable plan approved by the court toward the integration of the child into the parental home. K.S.A. 38-2269(c)(3). There is no dispute that parents fulfilled their case plan tasks by the time of the termination hearing. But professionals connected to the case repeatedly indicated that parents have not made secondary changes in order to justify reintegration. What does that mean? It generally means that a parent has taken steps toward improvement, to wit:  educational programs, but the court is not able to discern any real-world results such as improved parenting and

14

more stability for the child. Instead, the parent continues to make poor and counterproductive parenting decisions. In other words, they have not been able to apply the things they have learned to keep their children safe.

Here, Mother was provided a reasonable plan to allow her to integrate the children back into her home. That included not only classes but demonstrating that she can keep her home clean and safe and that she can properly care for the physical and emotional needs of her children. She was given coursework on basic tasks, such as learning how to properly care for and provide for her children and control her emotions. After such instruction, it was incumbent upon her to show that she could actually safely and appropriately care for and provide for her children.

The children came into state protective custody because one had been physically abused and witnessed familial physical abuse and was fearful of more abuse, one was not being fed enough food to survive, and a new baby entered the world that Mother could not clothe or feed without direction from nursing personnel. As the district judge noted, the professionals involved in this case did not believe Mother could safely parent her children. Even S.H. agreed that reintegration was not possible as long as the home was not in the proper condition.

There is clear and convincing evidence to support the district court's decision to terminate Mother's parental rights based on this statutory factor.

These four factors and the evidence to support them are more than sufficient to affirm the district court's decision regarding Mother's unfitness and the ultimate termination of Mother's parental rights. And Mother presents no argument on appeal specifically challenging these four factors. But Mother has raised one issue, for the first time on appeal, regarding the proper application of the facts supporting the court's fifth finding.

15

v.     *Mental or physical disability that renders the parent unable to care for the needs of their child—K.S.A. 38-2269(b)(1)*

Finally, in determining whether a parent is unfit to parent their child, the court must consider whether the parent has a mental or physical disability that renders the parent unable to care for their child. K.S.A. 38-2269(b)(1). For the first time on appeal, Mother contends the district court erred in terminating her parental rights because "[w]hile the trial court acknowledged Mother's mental disability and considered the causal relation between Mother's mental deficiencies and potential harm to the children, it did not consider the availability of and use of accommodations for the disability, including adaptive equipment and support services, as required by K.S.A. 38-2201(c)(2)."

That statute provides that "[t]he disability of a parent shall not constitute a basis for a determination that a child is a child in need of care, for the removal of custody of a child from the parent, or for the termination of parental rights without a specific showing that there is a causal relation between the disability and harm to the child." K.S.A. 38-2201(c)(1). The statute goes on to require that "[i]n cases involving a parent with a disability, determinations made under this code shall consider the availability and use of accommodations for the disability, including adaptive equipment and support services." K.S.A. 38-2201(c)(2).

According to Mother, "[t]he failure of the court to even mention whether availability of and use of accommodations for Mother's disability were available and administered requires reversal on its face, given the clear failure to comply with K.S.A. 38-2201(c)(1)-(2)." Mother further argues "the trial court erred in terminating Mother's parental rights without fully considering the adequacy of accommodation provided for her disability, and its decision is not supported by clear and convincing evidence." "Therefore," Mother concludes, "the trial court's decision should be reversed, and the case remanded for further proceedings with appropriate support in place for Mother."

16

Although this is not something Mother argued before the district court, it is sufficiently related to the evidence necessary to support a termination based on a mental disability that we do find it preserved. And although it makes no difference in the ultimate finding, we agree that the district court failed to show that Mother suffered a mental illness that rendered her unable to care for the needs of her children. And this is because there was no evidence that Mother was in fact mentally ill.

Mother denied having a mental illness and denied ever being diagnosed with a learning disorder. The psychologist who conducted Mother's court ordered mental health assessment was not able to arrive at a diagnosis because of the invalid testing results. Mother did indicate that she is receiving social security disability payments for a "comprehension" issue for which she has never seen a doctor. She further indicated that her comprehension issue does not affect her much—she only has trouble understanding big words.

There was a common thread in the testimony that Mother seemed to need to have things explained to her many times. S.H. testified that Mother does have a problem understanding things sometimes and needs a little more coaching than most people. The testimony kept returning to her inability to understand the proper way to add thickening to liquids he consumed and understanding the full ramifications of her children's medical issues. But there was testimony that she fully understood the concerns regarding the condition of her home. Some concerns about her comprehension level seem to correlate with times she was feeling overwhelmed. For example her whole presentation changed on her second appointment to the psychologist when she got lost on the way to his office. She was also confused and upset when she got lost in the parking lot of the hospital when she went to visit M.H. And finally, she explained she was trying to rest and she was having a lot of medical issues related to the birth of J.H. while she was in the hospital. She seems to suggest that she understood how to care for a baby, but she just did not feel physically able to do so during her recovery.

17

We agree that Mother's behavior throughout this case was concerning. But there was no evidence that it was because of a diagnosed mental illness. It could just as likely be that she has a slightly lower IQ than average which makes it difficult for her to understand some tasks or instructions. And this is exacerbated when she is under stress. Or it could be that she simply did not feel she did anything wrong in the care of her children and she was not compelled to comply.

There was no evidence other than Mother's own testimony regarding a mental health diagnosis that formed the basis for her to receive social security disability payments or even any evidence that she receives them at all. Accordingly, we need not reach Mother's concern that she was not provided with accommodations under the disability provisions of the code. It was her failure to demonstrate that she could adequately maintain the safety and health of her children that resulted in the termination of her parental rights, not any mental disability, and the district court erred in including this factor as a basis for termination. But in the final calculus, it makes no difference. The other four factors relied upon by the district court present the necessary clear and convincing evidence for a finding of unfitness.

B.   *The evidence to support the court's finding that Mother's unfitness is not likely to change in the foreseeable future*

In addition to the unfitness finding, the court must find the evidence clear and convincing that the conduct or condition which created the lack of fitness is unlikely to change in the foreseeable future. K.S.A. 38-2269(a). When determining whether Mother's conduct was likely to change, we are to consider the "'foreseeable future . . . from the child's perspective, not the parent['s], as time perception of a child differs from that of an adult.'" *In re R.S.*, 50 Kan. App. 2d 1105, 1117, 336 P.3d 903 (2014).

18

Mother argues that the record indicates that she showed significant improvement when she was provided with a notebook to keep notes on things that went well and things she needs to work on. However, when a new case worker came on the case the notebook was discontinued and Mother's progress reversed. Mother argues that without the notebook Mother no longer had a familiar routine and became overwhelmed and started refusing services. But if provided the right assistance, she could safely parent her children.

We have no trouble finding that the evidence supported the district court's finding that Mother will not be able to safely parent her children in the foreseeable future even if she returns to keeping a journal or notebook. There is no evidence that she has ever been prevented from using a notebook. And, if she believed this journaling activity was helping her, it was incumbent upon her to continue it. This appears to be another example of a failure to do what is necessary to regain custody of her children. Mother has had at least two years to show she can safely and adequately parent her children, yet she has not progressed to unsupervised visits or overnight visits.

There is clear and convincing evidence to support the district court's decision to terminate Mother's parental rights based on the unlikelihood that her unfitness is likely to change in the foreseeable future.

C.      *The evidence to support the court's finding that termination of Mother's parental rights was in the best interest of her children*

Once a court concludes that a parent is unfit, the court must then consider whether termination of parental rights is in the best interests of the children. In considering the children's best interests, the court should place the most weight on the physical, mental, and emotional health of the children. K.S.A. 38-2269(g)(1). "If the physical, mental or emotional needs of the child would best be served by termination of parental rights, the

19

court *shall* so order." (Emphasis added.) K.S.A. 38-2269(g)(1). Mother ties this back to a failure to provide accommodations for her disability as required by K.S.A. 38-2201 (c)(2). But we have already found that there was insufficient evidence, based on her own testimony, that Mother had any disability that requires accommodation.

At this stage, the district court is given broad discretion to determine the best disposition for the children. See *In re R.S.*, 50 Kan. App. 2d at 1115-16. This court reviews the district court's dispositional decision for an abuse of judicial discretion, which happens when no reasonable person would agree with the district court's decision, or the district court bases its decision on a factual or legal error. See *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, 60, 392 P.3d 68 (2017). The party claiming an abuse of discretion bears the burden of establishing such abuse. *In re K.E.*, 294 Kan. 17, 23, 272 P.3d 28 (2012); *In re P.J.*, 56 Kan. App. 2d 461, 466, 430 P.3d 988 (2018).

Mother does not suggest any legal or factual error in the court's decision. Instead, Mother is left with an argument that the district court's decision was unreasonable. She argues that it is not in her children's best interests to terminate her parental rights because it will disrupt "established bonds, undermines the children's stability, and ignores the potential for Mother's success with reasonable accommodations."

But the children have been out of their Mother's custody now for over two years, and there is no indication that Mother's unfitness will change in the foreseeable future. A rational fact-finder could find it was in her children's best interests to terminate Mother's parental rights and allow her children to obtain permanency through adoption into a stable and safe home that can provide for their physical and emotional needs.

Affirmed.