NOT DESIGNATED FOR PUBLICATION

No. 124,948

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of S.M.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; MICHAEL J. HOELSCHER, judge. Opinion filed November 23, 2022. Affirmed.

*Laura E. Poschen*, of Law Office of Laura E. Poschen, of Wichita, for appellant natural mother.

*Julie A. Koon*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before GARDNER, P.J., WARNER and COBLE, JJ.

PER CURIAM: S.R. (Mother) appeals the district court's order finding her an unfit parent and finding it in the best interest of her child, S.M., to terminate her parental rights. Mother appeals, arguing the district court's decision is not supported by clear and convincing evidence. But having carefully reviewed the record, we find it supports the district court's conclusions. As a result, we affirm.

*Procedural Background*

Mother and Father are the natural parents of S.M. The district court terminated the parental rights of both parents, but Father is not part of this appeal.

1

In November 2020, S.M. was born prematurely at the hospital. Just after, the Kansas Department for Children and Families (DCF) received two intakes about Mother and S.M. The intakes alleged that Mother had been homeless during her pregnancy, had a history of mental health issues, and had not been taking her medications. The hospital also reported that Mother acted aggressively toward hospital staff, refused some of her care, had delusions, did not answer physician's questions about her medical history, and threatened to leave the hospital against medical advice. The hospital eventually sedated Mother and placed her on an involuntary psychiatric hold. S.M. was placed in police protective custody right after.

Emily Daggett, a DCF child protective services worker, went to the hospital after receiving the intakes. She interviewed Mother, Father, a physician, and a hospital social worker. Daggett said Mother was coherent but delusional, and she would not provide Daggett with any of the requested information. Mother also made multiple unusual remarks about herself, Father, DCF, and the hospital staff. Father told Daggett that he and Mother had been in a relationship for about a year before S.M.'s birth. Father did not know when Mother stopped taking her medication, but he said that Mother was a different person when she did. Father also told Daggett he used a false name while at the hospital because he had outstanding warrants. The hospital social worker reported that Mother had been diagnosed with schizophrenia and anxiety. The physician reported that Mother had delusions and had been experiencing extreme psychosis, and the physician did not believe Mother could adequately care for S.M. because of her mental state. Daggett included this information in the child in need of care (CINC) petition filed shortly after S.M. was born.

When the district court held a temporary custody hearing, Mother appeared but waived her right to an evidentiary hearing, and the district court placed S.M. in DCF custody. A couple of weeks later, Father was arrested on his outstanding warrants. Mother failed to appear at the adjudication hearing in January 2021, and the district court

2

found her in default. As a result, the district court adjudicated S.M. as being a CINC as to Mother and ordered S.M. to remain in DCF custody in an out-of-home placement. A few days later, Father entered a no-contest statement, and the district court adjudicated S.M. as being a CINC as to Father as well.

In February 2021, the district court held a dispositional hearing for both parents. Mother did not appear, and her attorney said she had been admitted to the hospital for mental health issues. The district court ordered S.M. to remain in DCF custody and adopted the proposed permanency plan. The State requested a finding that reintegration was not viable, but the district court declined to make that finding. In April 2021, the district court held a permanency hearing. Mother again did not appear, and her attorney said she had not been in contact. The State renewed its request to find that reintegration was no longer viable, but the district court again declined to make that finding.

In May 2021, Mother contacted DCF by phone. Mother reported she been hospitalized for the previous four months because she contracted frostbite and had some of her fingers amputated. Mother told DCF she would be in contact after being released from the hospital so she could begin working the court orders in the case. Mother also said she had been working on getting an apartment.

The district court held another permanency hearing in June 2021, and Mother appeared by Zoom. Again, the State requested a finding that reintegration was not viable. Mother opposed the request, arguing that only six months had passed since the case began, and she had been in the hospital for four of the six months. Mother also said she would be released from the hospital soon, at which point she would begin working the district court's orders. Even so, the district court found that reintegration was no longer viable and ordered the State to file its motion to terminate parental rights. A couple of weeks later, the State moved to terminate parental rights for both parents.

3

In December 2021, the district court held the evidentiary hearing on the State's motion. At the beginning of the hearing, Mother moved for a continuance, requesting the district court give her more time to work the case. In support, Mother argued she had completed many of the case plan tasks and had been working on her mental health issues. Father also moved for a continuance, but the State opposed it given how much time had passed since the case began. Ultimately, the district court denied the motions and held a termination hearing.

At the end of the termination hearing, the district court took the matter under advisement. The next month, the district court issued its ruling. After summarizing Mother's testimony from the termination hearing, the district court found Mother's testimony lacked credibility because she "struggled to perceive events accurately because of her mental-health issues." Similarly, the district court found that Father's testimony lacked credibility. In contrast, the district court found the testimony from A.M., Daggett, and case worker Mallory Zimmerman credible. Ultimately, the district court found Mother unfit to parent S.M., found Mother's conduct or condition was unlikely to change in the foreseeable future, and found it in S.M.'s best interests to terminate Mother's parental rights. As a result, the district court terminated Mother's parental rights.

Mother timely appeals.

*Did the District Court Err by Terminating Mother's Parental Rights?*

Mother argues the district court erred by terminating her parental rights because insufficient evidence supports that decision.

A parent has a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution to make decisions about the care, custody, and control of the parent's child. Before a state can deprive a parent of the right to the

4

custody, care, and control of a child, a parent is entitled to due process of law. *In re P.R.*, 312 Kan. 767, 778, 480 P.3d 778 (2021). But this fundamental right to parent is not without limits. 312 Kan. at 778. Because child welfare is a matter of state concern, the State may assert its interest "through state processes designed to protect children in need of care." *In re A.A.-F.*, 310 Kan. 125, 146, 444 P.3d 938 (2019).

When reviewing a finding of parental unfitness, this court must determine, after reviewing all the evidence in a light most favorable to the State, whether a rational fact-finder could have found the determination to be highly probable, that is, by clear and convincing evidence. See *In re B.D.-Y.*, 286 Kan. 686, 705-06, 187 P.3d 594 (2008); *In re K.P.*, 44 Kan. App. 2d 316, 318, 235 P.3d 1255 (2010). In making this determination, the appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. at 705.

Under K.S.A. 38-2269(a), the State must prove a parent "is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." The statute provides district courts with a nonexclusive list of nine factors to consider when determining unfitness. K.S.A. 38-2269(b). But clear and convincing evidence of a single statutory factor under subsection b can be a sufficient basis for a district court's determination that a parent is unfit. K.S.A. 38-2269(f).

Here, the district court found that the evidence supported termination of Mother's parental rights under two factors: K.S.A. 38-2269(b)(1) and (b)(7).

*K.S.A. 38-2269(b)(1)*

A district court may terminate a parent's rights to his or her child if clear and convincing evidence shows the parent is "unable to care for the ongoing physical, mental

5

and emotional needs of the child" because of the duration or nature of the parent's "[e]motional illness, mental illness, mental deficiency or physical disability." K.S.A. 38-2269(b)(1).

Mother's mental health is the primary issue in the case. Mother acknowledges she has a history of psychological hospitalizations, but she argues the district court erred by relying on this statutory factor. She claims she made progress in the six months before the termination hearing, she was taking her medications, and COMCARE employees had no concern that she would stop taking her medications. So we first review that testimony.

*Mother's Testimony*

Mother testified that she had been in a common-law marriage with Father for over a year at the time of the termination hearing. The two met at Mother's previous home, before she was evicted. After being evicted about a year before S.M.'s birth, Mother became homeless. During that time, she stayed with friends, family, or in a shelter while trying to find a permanent home. When Mother could not find a place to stay, she slept on the street. She got frostbite on one of her hands in February 2021 after she could not find a place to stay.

Mother admitted to having delusions in the past when she did not take her medication, but she denied ever being violent with others. Mother had been hospitalized more than 20 times because of her mental health issues, beginning in 2008. Her most recent hospitalization was from February 2021 to July 2021. During that time, Mother went back and forth between two hospitals: one dealt with her mental health issues and the other dealt with physical health issues related to the amputation of her fingers. Mother claimed to be cooperative with the medical team trying to treat her frostbite, though she admitted she was upset with the team because she did not understand why she was in the

burn unit. When asked whether the burn unit had to restrain her, Mother said she did not remember.

As to S.M., Mother admitted she did not have custody because she and Father could not provide a stable home when S.M. was born. Both were homeless during Mother's pregnancy, and they lived on the streets when they could not stay with family, in a hotel, or in a shelter. After S.M. was born, Mother's housing instability continued until she was released from the hospital and moved into her apartment.

Since October 2021, Mother lived in a one-bedroom apartment. She was unemployed, but she received disability payments that she used to pay for her apartment, utilities, and other expenses. Mother received disability because diagnoses of post-traumatic stress disorder (PTSD), severe anxiety, schizoaffective bipolar disorder, and chronic insomnia. Mother said her PTSD and severe anxiety had caused her more problems than her schizoaffective bipolar diagnosis, but she also said she functioned at a high level. Similarly, she claimed her PTSD and anxiety did not change her behavior because she maintained her bills, could work, went to church, went grocery shopping, visited S.M., and went to medical appointments. In other words, Mother said she functioned normally and did regular things that people do, she just had to take medications to help her. In Mother's opinion, her housing situation was the only thing that prevented her from taking care of S.M. after he was born.

That said, Mother admitted she had not been taking medications during her pregnancy because she worried that it could adversely affect S.M.'s health, though she did not consult a physician about her concerns. Mother pointed to the fact she had not taken her medications when asked about her delusional state at the time of S.M.'s birth. She also admitted that she had stopped taking medications in the past before her pregnancy, but she did not blame her previous hospitalizations solely on this fact. Mother

7

pointed to the fact she had gained weight when asked why she had stopped taking her medications.

At the time of the termination hearing, Mother had been prescribed multiple medications, which she said she had been taking. She also claimed she had suffered no recent delusions. But when asked how her behavior differed when she took her medications compared to when she did not take them, Mother said her behavior was the same. She also said she had done nothing unusual, and she disagreed that she had any tendency to be violent. That said, Mother acknowledged that she had been restrained to her bed while at the hospital giving birth to S.M.

Going forward, Mother said the district court should not be concerned about whether she might be hospitalized again for her mental health issues because she was working closely with COMCARE and other organizations. She also had the support of her family and again noted that she had recently been taking her medications.

Mother also said she planned to have Father's support in raising S.M. after Father was released from prison. She considered herself to be in a common-law marriage with Father. Mother said she had no concerns about leaving S.M. with Father, even though she knew he had been imprisoned on eight previous occasions, including once for voluntary manslaughter. Mother said people learn from their mistakes.

Mother visited S.M. once a week at the Saint Francis Ministries (SFM) office. The visits lasted one hour and were supervised by SFM employees. Aside from once when an SFM employee had to tell Mother she could not feed S.M. certain food, Mother thought the visits went well. For the most part, Mother also believed her conversations with the SFM employees had been appropriate. She denied ever telling any SFM employee she had communicated with Zeus, but she said it was possible she told one of them she could

read minds. At the termination hearing, Mother affirmed her ability to read minds and said she acquired the ability a couple of years ago.

Aside from S.M., Mother has another child, N.M., who was 17 years old at the time of the termination hearing. Mother claimed she had joint custody of N.M., though N.M. had lived with her father, A.M., for the past eight years. Mother admitted she did not see N.M. often because of N.M.'s school and work schedule. Mother last saw N.M. the previous Thanksgiving. At the time of the termination hearing, S.M. also lived with A.M.

*COMCARE Workers' Testimony*

Mother also relies on the testimony of two COMCARE workers who testified on her behalf: Vanessa Onyemechi and Roselyn Stansberry. Onyemechi was Mother's case manager from August 10, 2021, to October 18. Mother met with her once a week and they discussed Mother's mental health goals. Onyemechi helped Mother get medical injections twice a month and provided general extra support when Mother needed it. Onyemechi testified that Mother had missed no appointments and had taken all her medications when the two worked together. Because of this, Onyemechi had no concern that Mother would stop taking her medications after they stopped working together.

Stansberry was the next COMCARE case manager to work with Mother. Like Onyemechi, she had no concern that Mother would stop taking her medications. This was because she and Mother had discussed the importance of medical compliance, and Mother continued to be engaged with her. Mother had been proactive in scheduling her appointments and in calling Stansberry to take her to them. If Mother continued these good habits consistently, Stansberry believed Mother would continue with treatment, even though Mother was a volunteer patient.

Having reviewed the testimony above, we agree that some evidence supports Mother's assertions. But the district court also had other contradictory evidence to consider, which we review below. Despite Mother's claims, we find clear and convincing evidence supporting the district court's findings under K.S.A. 38-2269(b)(1).

*The Other Evidence*

We begin with Father's testimony. At the time of the termination hearing, Father was incarcerated but he expected to be released shortly after the hearing. Before his incarceration, Father was homeless for about eight years, but he planned to live at a family member's house after being released, and to get a job.

Father and Mother had been in a relationship for about a year before he went to prison. Both were homeless then and Mother became pregnant. They stayed in hotel rooms when they had money; otherwise, they would stay on the outskirts of town. Father planned to maintain his relationship with Mother after being released, although he knew he could not move in with her because she lived in Section Eight housing. Even so, Father considered them to have a common-law marriage and he believed the two could support each other and S.M.

As to Mother's mental health, Father would not describe her behavior as delusional when she did not take medication. Instead, Father noticed subtle changes in Mother's behavior when she did not take medication. And when asked why he told Daggett he had concerns about Mother's behavior when they spoke at the hospital shortly after S.M. was born, Father said Daggett had exaggerated what he had told her. Similarly, he claimed Daggett twisted his words when she reported that Father said he did not understand why Mother did not get help through COMCARE. But Father agreed that he would help Mother participate in therapy, and he supported Mother's taking whatever medication she needed.

A.M. testified after Father. When S.M. was two months old, he came into A.M.'s care. S.M. had lived with him, N.M., and his fiancée during the 10 months before the termination hearing. A.M. described S.M. as a great kid and said N.M. and S.M. had bonded and have a great relationship. Similarly, his fiancée also has a great relationship with S.M., and they considered themselves an adoptive resource for S.M.

As to Mother, A.M. was in a relationship with her for about six years, from 1998 to 2005. Mother did not have any mental health incidents during the relationship. The first time he recalled any issues was on New Year's Eve in 2008, when he went on vacation to Las Vegas and left N.M. with Mother. A.M. and Mother did not have a formal custody arrangement then, so he typically had custody of N.M. during the week, and Mother would have custody on weekends. When he returned to Kansas and went to pick up N.M. from Mother's apartment, he learned that Mother had been hospitalized and that N.M. had been placed in protective custody. Police had not told him about the incident sooner because Mother had not told police about him. DCF then told him he would have to file for custody of N.M. before she could be released to him, which he did, and he has had residential custody of N.M. ever since. After that incident, A.M. had custody of N.M. during the week, and Mother had parenting time every other weekend, if she did what she was supposed to for her mental health.

When asked about other incidences of Mother's mental health issues, A.M. recalled that Mother had told him that N.M.'s father was Justin Timberlake. He also recalled an incident around Christmas in 2014. N.M. had planned to stay at Mother's house, but Mother had an episode, so N.M. locked herself inside a bathroom, called A.M., and told him to pick her up because she was scared. A.M., who lived in a different town, called the police and had a friend pick up N.M. Since then, N.M. saw Mother rarely, usually only during family events with Mother's family. A.M. could not recall the last time N.M. stayed with Mother. He also limited his own interactions with Mother—he had little contact with her over the previous decade because their conversations were not

11

constructive. Since 2009, A.M. estimated that Mother's longest period of mental health stability was about 6 months.

Daggett testified next. DCF assigned Daggett to investigate the intake reports received shortly after Mother gave birth to S.M. at the hospital. Daggett testified about the allegations in the intakes, including Mother's history of mental health issues and her behavior toward hospital staff. A few days after receiving the intakes, Daggett went to the hospital to meet with Mother.

At the request of one of Mother's doctors, a few security guards accompanied Daggett to Mother's room. Daggett described the interview with Mother as unsuccessful because Mother could not provide the information she requested. Mother was calm but orally aggressive because she thought Daggett had called security on her. Mother questioned Daggett about her identity, accused Daggett of trying to steal S.M., asked Daggett for her supervisor's information, claimed she had died multiple times while in the hospital, claimed to be a practicing doctor and a federal judge, claimed her parents were celebrities, stated she and Father were married, told Daggett that S.M.'s father was the Prime Minister of France and Canada, and claimed she was being watched by cameras in the room, although Daggett said there were none.

Daggett also interviewed Father at the hospital. After speaking with Mother and Father, Daggett recommended to the district attorney that DCF take custody of S.M. Daggett did not believe S.M. should have been released to Mother because of her mental state after giving birth, history of mental health issues, lack of medication, and lack of housing.

Family support worker Leah Jacobs also testified. Jacobs supervised visits and met with the children monthly. In some cases, she or Mallory Zimmerman also intermittently

met with the parents. Zimmerman and Jacobs both reported to their supervisor, Mattie-Kay Stewart.

Jacobs started working on S.M.'s case a little over a month after S.M. was born. Because of Father's incarceration, Jacobs had never supervised any visits between S.M. and Father. She did, however, observe visits between S.M. and Mother, beginning in May or June 2021, when Mother contacted SFM. After Mother did so, she and S.M. had supervised visits for one hour at SFM, which Jacobs thought went fine, except for few instances.

One time Mother tried to feed S.M. fruit snacks, which were not appropriate for S.M. because of his age. Jacobs also noted that Mother sometimes struggled to change S.M.'s diaper and buckle him into a car seat, although she acknowledged that did not seem abnormal for someone who essentially had the use of one hand, as did Mother. At other times, Mother placed S.M. on a couch and walked away—this concerned Jacobs because S.M. could easily roll off the couch. That said, Mother always caught S.M. before he hit the ground when he did roll off the couch.

Zimmerman, the permanency specialist, helped parents complete court orders so their children could reintegrate with them. Like Jacobs, Zimmerman started working on S.M.'s case a little over a month after S.M. was born. At that time, SFM knew Father was incarcerated but did not know Mother's whereabouts because she had not been in contact with the case team. This changed in May 2021, when SFM learned Mother had been hospitalized. A month later, Mother called Zimmerman and asked why A.M. had been at a court hearing and why SFM had not sent her any paperwork while she had been hospitalized. During that conversation, Mother used profanity toward her and said S.M. should have never been removed from Mother's care.

Zimmerman testified that she observed some of Mother's visitations with S.M. and echoed the same safety concerns as Jacobs. As a result, Zimmerman never considered moving the visits beyond one-hour supervised visits at SFM. Statements by Mother also caused Zimmerman concern for Mother's mental health—Mother had told her:

- in September 2021, that Mother had been misdiagnosed with schizophrenia but had the ability to read other people's minds;
- during a phone call that same month, that she had been contacted by Zeus, who told her S.M. would be taken away for a time but would later return; and
- another time, that she had a psychology degree and did not need therapy.

Zimmerman found that Mother never acknowledged why S.M. had been removed from her care. Mother's comments that her behavior was not any different when she was off her medications also concerned Zimmerman because it showed Mother's belief that she did not need her medications, which could lead her to stop taking them. SFM prefers that parents show periods of stability before their children can be reintegrated. If Mother stopped taking her medications, that could lead to delusional thoughts and more hospitalizations, which would jeopardize the stability Mother needed to show.

Zimmerman originally recommended in June 2021, about 6 months after the case was filed, that reintegration was not viable. Since then, Zimmerman agreed that Mother had completed case plan tasks set out by the district court, including maintaining stable housing, completing parenting classes, attending therapy, attending visitations, and taking medications. Yet despite Mother's progress in these areas, Zimmerman did not change her original recommendation of termination.

Zimmerman believed Mother would need to maintain the progress in these areas, as well as remain not hospitalized for a year after the termination hearing before S.M.

14

could be reintegrated. Given Mother's history of mental health issues and hospitalizations, Zimmerman did not believe Mother could do that. And S.M. would have been a CINC for two years at that point, despite only being two years old. For these reasons, Zimmerman supported the termination of Mother's parental rights and believed it would be in S.M.'s best interests to be adopted.

Stewart testified that she had been assigned to the case from its inception. Zimmerman sought guidance from Stewart a few times in this case after Mother made abnormal comments during a visitation or phone call. Stewart told Zimmerman to document what happened and to try to redirect Mother when those comments occurred.

Stewart agreed that Mother started attending therapy a couple of months before the termination hearing, but she could not say whether Mother had regularly attended. Mother's therapist conveyed that Mother had not rescheduled her next appointment because she wanted to wait until after the termination hearing to do so. Stewart did not believe that the two COMCARE individuals that Mother worked with were licensed therapists. As a result, Stewart did not know whether Mother was actively engaged in mental health treatment.

Like the other SFM employees, Stewart had concerns about Mother's history of mental health issues, as well as Mother's ability to maintain mental health stability going forward. When asked about the potential risks of reintegrating S.M. with Mother if she stopped taking her medications, Stewart pointed to Mother's behavior with the hospital staff when S.M. was born. Stewart was also concerned with Mother's testimony that her behavior was the same while on or off her medications, for the same reasons that the statement concerned Zimmerman.

Stewart also had concerns about Mother's intentions to maintain a relationship with Father when he was released from prison. This was because Mother and Father had

not shown long periods of stability in their lives, either before or during their relationship, and because of past incidents of domestic violence.

On cross-examination, Stewart agreed that mental health history does not automatically preclude reintegrating a child with his or her parent; each case depends on its own circumstances. But Stewart did not believe that Mother had shown the stability required to reintegrate with S.M., though Stewart acknowledged Mother's progress in the five or six months before the termination hearing. Like Zimmerman, Stewart believed Mother would need to show consistent progress for a year from the date of the termination hearing. That said, Stewart did not believe Mother should be given that time because of S.M.'s need for stability and permanency. Stewart explained that children who face long periods of instability in their lives are at a greater risk for adverse effects to their social and emotional development. For these reasons, Stewart did not believe that Mother was fit to parent S.M. and believed S.M.'s best interests would be served by adoption.

*Conclusion*

The district court specifically found much of Mother's testimony unreliable, yet it found Zimmerman and Stewart's testimony credible. Mother does not claim that the district court ignored the evidence she relies on. Essentially, Mother asks this court to reweigh the same evidence presented to the district court and to reach a different conclusion. But that is not this court's function on appeal. See *In re B.D.-Y.*, 286 Kan. at 705. In sum, clear and convincing evidence shows Mother has mental health issues that render her unable to care for S.M. As a result, the district court did not err by terminating Mother's parental rights based on K.S.A. 38-2269(b)(1).

Because one factor alone is sufficient for termination here, see K.S.A. 38-2269(f), we need not reach Mother's assertion that the district court erred in finding a second

16

factor also existed—that reasonable efforts by public or private agencies to rehabilitate her family failed. K.S.A. 38-2269(b)(7).

*Mother's Conduct or Condition is Unlikely to Change in the Foreseeable Future*

In addition to determining that a parent is unfit, a district court must determine whether the conduct or condition that made them unfit is unlikely to change in the foreseeable future. K.S.A. 38-2269(a).

We measure the "foreseeable future" in these cases by using a child's perspective.

"When assessing the foreseeable future, this court uses 'child time' as the measure. The Revised Kansas Code for Care of Children—K.S.A. 2018 Supp. 38-2201 et seq.— recognizes that children experience the passage of time in a way that makes a month or a year seem considerably longer than it would for an adult, and that different perception typically points toward a prompt, permanent disposition. K.S.A. 2018 Supp. 38-2201(b)(4); *In re M.B.*, 39 Kan. App. 2d 31, 45, 176 P.3d 977 (2008); *In re G.A.Y.*, No. 109,605, 2013 WL 5507639, at *1 (Kan. App. 2013) (unpublished opinion) ("'child time'" differs from "'adult time'" in care proceedings 'in the sense that a year . . . reflects a much longer portion of a minor's life than an adult's')." *In re M.S.*, 56 Kan. App. 2d 1247, 1263-64, 447 P.3d 994 (2019).

Mother's primary contention here focuses on her relatively good performance in the six months just before the termination hearing. Mother argues that, during that time, she showed stability for several months as she completed case plan tasks, regularly attended visitations, and had clean drug tests. And both COMCARE workers believed Mother would succeed going forward.

Although these contentions are true, the district court considered all this evidence in its ruling. It noted, for example, that Mother had lived in an apartment since October

2021. And the district court discussed Mother's visitation history with S.M. and noted the medications Mother had been taking. So the district court did not ignore the evidence Mother points to on appeal. Instead, the district court considered all the evidence and concluded that Mother's conduct was unlikely to change in the foreseeable future. Again, Mother is asking this court to reweigh the same evidence presented to the district court but to reach a different conclusion. But that is something we cannot do. See *In re B.D.-Y.*, 286 Kan. at 705.

Mother's argument tends to ignore the evidence presented by the State. When ruling, the district court relied on the exhibits and the testimony from A.M., Zimmerman, and Stewart about Mother's history with mental health issues. This court has stated that "[t]he best indicator of future performance is past performance. Accordingly, courts can consider a parent's past history as evidence regarding the reasonable likelihood of any change in parental fitness." *In re S.A.*, No. 123,556, 2021 WL 4224894, at *9 (Kan. App. 2021) (unpublished opinion) (citing *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 [1982]), *rev. denied* 315 Kan. 968 (2022). Thus, the district court did not have to consider only Mother's most recent behavior. It heard conflicting evidence on this issue, considered that evidence along with all the evidence in the case, made credibility calls on the testimony, and reached a decision supported by substantial, competent evidence of a clear and convincing nature.

Mother's overarching problem to her parenting is her mental health. By the termination hearing, a year had passed since DCF took custody of S.M., so DCF has had custody of S.M. his entire life. During that time, Mother had been admitted to a psychological hospital twice and had been admitted to psychological hospitals more than 20 other times in the previous 15 years. Though we applaud her recent stability, that stability does not refute the pattern she set in the past 15 years. Mother also failed to progress with visitation. As a result, Mother would be unable to reintegrate S.M. into her home in the foreseeable future, viewed in "child time." Thus, the district court did not err

18

by concluding Mother's conduct or condition is unlikely to change in the foreseeable future. K.S.A. 38-2269(a).

Upon finding unfitness of a parent, "the court shall consider whether termination of parental rights . . . is in the best interests of the child." K.S.A. 38-2269(g)(1). The district court did so, finding that termination of Mother's parental rights was in S.M.'s best interests, and Mother does not challenge that finding on appeal. See *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018) (we consider issues not adequately briefed to be waived or abandoned). We thus find no error in the district court's decision.

Affirmed.