NOT DESIGNATED FOR PUBLICATION

Nos. 128,950
128,951

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of G.R.H. and S.J.H., Minor Children

MEMORANDUM OPINION

Appeal from Sedgwick District Court; GREGORY D. KEITH, judge. Submitted without oral argument. Opinion filed January 23, 2026. Affirmed.

*Kaitlin M. Dixon*, of Dixon Law Group, of Wichita, for appellant natural father.

*Kristi D. Allen*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before BRUNS, P.J., HILL and ATCHESON, JJ.

PER CURIAM: This is an appeal from the district court's order terminating the parental rights of Father to G.R.H. and S.J.H. The district court found that Father was unfit, his unfitness was unlikely to change in the foreseeable future, and termination of parental rights was in the children's best interests. After reviewing the evidence in the record on appeal, we conclude the district court's finding that Father is unfit under Kansas law to be supported by clear and convincing evidence. We also conclude that the district court's finding that the conditions leading to Father's unfitness are unlikely to change in the foreseeable future is supported by clear and convincing evidence. Finally, we conclude that the district court did not abuse its discretion in concluding that the termination of Father's parental rights is in the children's best interests. Thus, we affirm.

1

*CINC Petition and Temporary Custody*

On May 24, 2023, after receiving calls about a lost child, a law enforcement officer found then 4-year-old S.J.H. walking alone in a neighborhood wearing a soiled diaper and without a shirt or shoes. S.J.H. was able to tell the officer that she lived in a yellow house. After the house was located, the officer smelled a strong odor of urine coming from the residence as he was walking up the driveway.

S.J.H. entered the house and yelled for her mother. The officer asked the mother—who had been sleeping in a back room—to step outside of the house to speak with him about finding S.J.H. walking around the neighborhood unsupervised. Although the mother attempted to slam the door shut, the officer placed his foot inside the doorway so she could not close it. From the doorway, the officer saw dog feces on the floor and smelled a strong odor of dog feces, urine, and trash.

The mother told the officer that her 5-year-old and 12-year-old children were also in the house. In completing a walkthrough of the house, the officer observed a significant amount of trash; furniture covered in dog urine and feces; and dirty dishes piled on the counters and floors. The officer also observed insects swarming over the trash and dishes. In addition, the smell of spoiled food emitted from the refrigerator. As a result of these observations, all four of the children living in the home at the time were placed into protective custody. Although Father and the mother had five children, the oldest—who was 16 years old—no longer lived at home.

The Department for Children and Families (DCF) was notified and assigned an investigator to the case. During the DCF investigation, it was reported that the younger

children did not attend school and that some of the older siblings often provided care for them. It was also reported that there was no hot water in the home.

At the time the children were taken into police protective custody, Father was in custody at the Sedgwick County Adult Detention Facility. Still, he was able to participate in a Team Decision Making (TDM) meeting to discuss the family's situation. Father indicated that he thought law enforcement was exaggerating the severity of the problem. But he did acknowledge that the house did not have hot water or gas. He also acknowledged that he and the mother had a history of cocaine use but stated they had stopped around the time S.J.H. was born. During the meeting, it was also discussed that G.R.H. and S.J.H. were very active children who were difficult to keep up with.

Two days after the TDM meeting, a child in need of care (CINC) petition was filed in Sedgwick County District Court concerning G.R.H., S.J.H., and their older siblings. The CINC petition alleged that the children were without proper care due to factors including that the children:  had been physically, mentally or emotionally abused or neglected; were without the care or control necessary for the children's physical, mental, or emotional health; were without adequate parental care, control or subsistence, and the condition was not due solely to the lack of financial means of the children's parents or other custodian; were not attending school as required by K.S.A. 72-3421 or K.S.A. 72-3120; and had been residing in the same residence with a sibling or another person under 18 years of age who had been physically, mentally, or emotionally abused or neglected.

The CINC petition further alleged that placement of the children with Father was not appropriate. It was noted that Father was in custody due to multiple outstanding criminal matters, and his release date was unknown. DCF asserted that Father failed to provide a safe and stable living environment for the children. Additionally, it was asserted that Father had a history of domestic violence and substance abuse.

3

The petition also raised additional concerns, including: Father had poor insight and failed to exercise proper judgment, which interfered with his parenting skills and ability to meet the needs of his children on a consistent basis; Father needed to stabilize his situation and utilize community resources to ensure the safety of the children; and Father had failed to protect his children.

On May 30, 2023, the district court held a temporary custody hearing. Father and the mother waived their right to an evidentiary hearing. At the conclusion of the hearing, the district court ordered that the children remain in DCF protective custody with out-of-home placement.

A few weeks later, Father was released from jail. As a result, a DCF caseworker met with him to discuss the temporary orders entered by the district court. The caseworker also attempted to have Father agree to complete some assessments. After that visit, Father changed his phone number and did not stay in touch with DCF. The caseworker attempted to locate Father on several occasions but was unable to do so. In the weeks that followed, Father did not make any progress on complying with the district court's orders. Moreover, Father failed to submit to required drug and alcohol testing and did not attend any supervised visits with the children in June or July 2023.

On July 21, 2023, the children were ordered to remain in DCF custody with out-of-home placement. Then, on September 7, 2023, the district court adjudicated the children to be in need of care pursuant to the statutory bases alleged in the CINC petition. The district court also approved a case plan with the goal of reintegration upon successful completion. The court-ordered case plan assigned Father the following six tasks: (1) abstain from the use of illegal drugs, alcohol, and any prescription drugs without a valid prescription; (2) sign all necessary releases of information for all court-ordered assessments, evaluations tests, and treatment programs, the results of such shall be made available to the court; (3) follow all recommendations resulting from the assessments and

treatment programs; (4) obtain and maintain full-time employment; (5) obtain and maintain appropriate housing; and (6) take prescribed medications.

At a permanency hearing held about eight months later, the district court found that progress toward the goal of reintegration was not adequate. As such, the district court found that reintegration was no longer a viable goal. Consequently, the district court ordered the State to file a motion for termination of parental rights within 30 days.

On May 20, 2024, the State moved to terminate the parental rights of both Father and the mother. As to Father, the motion alleged that he was unfit for the following reasons:

1. Failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family. K.S.A. 38-2269(b)(7).
2. Lack of effort to adjust his circumstances, conduct, or conditions to meet the needs of the children. K.S.A. 38-2269(b)(8).
3. Failure to carry out the requirements of a reasonable rehabilitation plan approved by the district court directed toward the integration of the children into the parental home. K.S.A. 38-2269(c)(3).

*Termination of Parental Rights*

On September 24, 2024, and November 20, 2024, the district court held an evidentiary hearing on the motion for the termination of the parents' parental rights with both parents appearing in person. Prior to the start of the hearing, the parents moved for a continuance because they were planning to enter an inpatient treatment program for substance abuse. Before ruling on the motion to continue, the district court ordered the parents to submit to a urinalysis (UA), and both were found to be positive for illegal drugs. The district court then granted a continuance regarding the older children but

5

denied the motion as to the younger two children. In doing so, the district court determined that it was in the best interests of G.R.H. and S.J.H. to proceed with the evidentiary hearing on their cases.

At the evidentiary hearing, the parties agreed to the admission of multiple exhibits for consideration by the district court. Likewise, both Father and the mother testified on the first day of the evidentiary hearing. In her testimony, the mother confirmed that the children had been placed in DCF custody after an incident where S.J.H. had "gotten out" of the house. She also testified that she and Father had signed up for a substance abuse treatment program. According to the mother, both she and Father had maintained stable housing in a home with utilities connected. She also testified that DCF had commended her and Father for maintaining visits with the children and reported that the "'parents appear to be bonded to their children.'"

Father testified that he and the mother had lived in a house with his uncle for more than six years. He indicated that he was the sole proprietor of an automobile detail business and had been working in this capacity for nine years. Although Father testified that he made about $1500 a month, he indicated that he did not provide any documents to support this testimony because he was not good at keeping books and had filed taxes only a few times. Father testified that he was incarcerated at the beginning of the case due to traffic citations and failing to appear in court. In addition, he testified that he was incarcerated again in September 2023 for failing to appear in court. He indicated that his driver's license was revoked and would be until 2027. Father also indicated that he was provided with a 30-day bus pass at the beginning of the case but had not received more passes when he asked for them.

Father testified that even though DCF provided him with a resource guide, he had trouble using it because many of the phone numbers were not correct, the resources were not available, or the programs were not approved. Father also claimed that he tried

6

searching for providers on Google, but he could not "get through to anybody." Father testified that he had completed a domestic violence course and a parenting course. But he admitted that he still had tasks that needed to be completed on his case plan, including the mental health assessment, compliance with drug testing, and receiving drug treatment.

When asked about his compliance with drug testing and drug treatment, Father responded:

> "[W]e've tried very hard to be as compliant as possible with it. . . . I'm not going to make any excuses. I know we should have been . . . sober by now, and we weren't, and we failed in the department. We did. We failed miserably. And that's why . . . I said today . . . if that's what it takes . . . I'll check myself in to inpatient today just to get a little bit more time. I want to be sober."

According to Father, he did not complete most of the requested drug tests because he could not get a ride to the testing facility and did not have the money for an Uber. Although Father did not believe that he had missed as many drug tests as DCF claimed, he admitted to missing "a lot of them." He also admitted to using methamphetamine and cocaine about once a week. He explained that he had been addicted to cocaine for five to seven years, but he did not start using methamphetamine until after his children had been removed from custody. Father testified that he had been sober for one month, which was around the time he was incarcerated in September 2023. Additionally, Father admitted that his use of illegal drugs had gotten worse since the children had been removed from the home.

Father testified that he was aware that he was supposed to complete a drug and alcohol evaluation but that he had put it off until about two weeks before the evidentiary hearing. He claimed he had "gone to NA meetings" but "[n]ot really consistently." Father indicated that if the district court wanted him to enter an inpatient treatment program, he was now willing to do so. Nevertheless, he acknowledged that he did not have an

7

inpatient bed lined up at that point. He also recognized the concern regarding children living in a home where substance abuse is occurring and asked for an additional month to demonstrate some progress.

Father testified that he expected the most recent hair follicle drug test—which was taken a few days before the evidentiary hearing—would be positive. He also acknowledged that his UA, which was taken the first day of the evidentiary hearing, was positive for Methylenedioxymethamphetamine (MDMA), which is commonly known as ecstasy or molly, but he denied knowingly using the substance and suggested it could have been laced in other drugs he had taken. Father further testified that he had informed a caseworker that he planned to attend a substance abuse evaluation at Higher Ground, but he failed to wake up in time and missed the appointment. He also testified that he intended to obtain an evaluation through the Knox Center, but he claimed the number he tried to call was disconnected.

When asked more questions about inpatient treatment, Father admitted that he did not have a bed or placement arranged at the time of the evidentiary hearing. Likewise, he could not identify a date, time, or location for any scheduled treatment. Ultimately, Father admitted that he had not yet taken the steps necessary to get the substance treatment he needed. He also acknowledged that he had reviewed the case plan with counsel and was aware of the tasks required of him.

Father pointed out that he had complied with some of the tasks required in his case plan. He testified that he had maintained stable housing other than when he had been in jail. Moreover, he testified that he was keeping the house clean and was current on paying for utilities. Father also testified that he had completed a couple of the classes that he was ordered to complete. Even though Father indicated that he was showing up to weekly supervised visits with the children, he acknowledged that he was often late for those visits due to transportation issues. Father asserted that he has a strong bond with his

children, and he did not believe it was in their best interests to be permanently taken from their parents.

At the conclusion of Father's testimony, the district court noted that the parties agreed that the evidentiary hearing could not be concluded that day. As a result, the district court recessed the hearing until November 20, 2024. In doing so, the district court advised Father that he was to submit to regular UAs and that the results should be reported when the hearing resumed. The district court also informed Father that he would need to provide documentation regarding his self-employment so that he could prove his income. In addition, the district court made it clear to Father that what he did over the next 60 days would be considered when making the ultimate determination regarding whether his parental rights should be terminated.

At the end of the first day of the evidentiary hearing, the results of Father's UA taken at the courthouse that day were admitted into evidence. Also, the district court took judicial notice of the official and social files on each child. The district court ordered that random UAs be conducted and requested an updated court report before the November court date. The district court also emphasized to Father that he needed to provide the caseworker with documentation of any completed tasks required by the case plan.

On November 20, 2024, the district court reconvened the evidentiary hearing. At the beginning of the hearing, the State admitted three additional exhibits including the updated court report and the results of the UAs that the mother and Father took that morning. The mother's UA test results were positive for methamphetamine, cocaine, and alcohol. Similarly, Father's UA test results were positive for MDMA and methamphetamine. Again, both the mother and Father testified on the second day of the evidentiary hearing. In addition, two caseworkers from EmberHope—who had worked with the family—testified.

9

Father testified that since the last hearing, he had started to attend a drug treatment program at Knox Center. Unfortunately, he did not consistently participate and had been discharged from the program. He testified that he then attempted to go to a different treatment provider that allowed walk-ins but was told the program was full. Father acknowledged that he did not reach out to anyone on his case team for assistance with getting into another treatment program.

Furthermore, Father admitted that he was not compliant with submitting to all of the UAs requested over the past 60 days. He also admitted that he had last used illegal drugs just three days before the hearing resumed. In addition, he admitted that his UA submitted that morning was positive for MDMA and methamphetamine. Father testified that he did not make it to a substance abuse evaluation in the last 60 days nor did he complete a drug treatment program. Still, Father asserted his belief that he could provide a drug-free home for his children and that the placement of the children back in the home immediately "would be the biggest booster to help us stay sober."

Father testified that a home inspection had yet to be completed because the background check on his uncle—with whom he resided—had yet to be completed. Father also acknowledged that he had not gotten a mental health assessment. Father asked the district court to give him an additional 30 days so he "would be able to give a clean UA" and receive treatment. When asked why he had not done so in the 60 days since the first day of the evidentiary hearing, Father indicated he had "finally got the bus passes just this Monday" to help with transportation.

Saundre' Clemons, a permanency specialist for EmberHope, testified that he was assigned to Father's case when the case was initiated. According to Clemons, the focus of the case plan was for the parents to maintain a clean home; to maintain sobriety; to assess mental health; to complete parenting classes and nutrition classes; and to address the domestic violence between the parents. Clemons testified that he met with the parents

monthly and discussed what tasks still needed to be accomplished. Clemons believed that Father understood what was expected of him.

Clemons also testified that he occasionally sat down with Father to review the available resources together. Clemons noted that Father was self-employed, but he had never provided documents to verify his income. Clemons acknowledged that the parents have "had their moments" when they had complied with some of the requirements of their case plan—such as completing a budget and attending parenting classes—but that many of the requirements remained unfulfilled.

Although Clemons testified that the parents had cleaned up the house and that the background check of the uncle had been successfully completed, he explained that in-home visitation was generally not authorized until the parents had achieved sobriety so that they would need minimum assistance from the case team. Additionally, Clemons noted that Father frequently arrived late for his visitation with the children or failed to check in as required.

Clemons testified that Father submitted to a drug and alcohol evaluation about two months prior to the first day of the evidentiary hearing but never provided a completed evaluation report. Clemons explained that although he had discussed the importance of drug treatment with Father, he was not in a treatment program. Clemons stated that he had testified that Father had missed between 15 and 20 required drug tests.

Clemons opined that he did not believe the parents had ever achieved sobriety throughout the case. Additionally, Clemons testified that he believed Father had not accepted responsibility for his substance abuse. Clemons asserted that if parents are still using methamphetamine, there would be no amount of parenting classes that could make them a safe parent. Clemons testified that he informed Father that he did not need a psychological evaluation—which costs about $1200—to meet the requirements of the

11

case but simply needed a clinical evaluation—which runs about $40 to $120—and he referred him to a place that could complete the evaluation. However, Father had failed to complete this task.

Regarding the question of transportation, Clemons testified that Father was provided with a bus pass when the case was initiated and had been provided with a second bus pass a few days prior to the second day of the evidentiary hearing. He explained that every family had a limited number of bus passes that could be provided to them and that if a family is not complying with court orders, the agency does not provide more passes. Clemons explained that in this case Father was initially provided with a bus pass but his compliance with court orders and the results of his drug tests did not improve.

Clemons recommended that Father's parental rights be terminated. He pointed out that Father had 17 months and 27 days to demonstrate his progress but had failed to comply with the requirements of the case plan ordered by the district court. Specifically, Clemons noted: (1) Father continues to struggle with sobriety; (2) Father does not have verifiable income; (3) the case team did not know if Father would be able to get the children to necessary appointments; and (4) G.R.H. had been diagnosed with autism since the case was initiated, and Clemons did not know if Father would be able to meet his higher standard of care.

Clemons testified that his recommendation took into consideration child time—which is the concept that children perceive time differently than adults—and pointed out that the two children who are the subject of this appeal have been in out-of-home placement for 17 months and 27 days of their lives. Further, Clemons opined that Father could not provide for the physical, mental, or emotional needs of the children either currently or in the foreseeable future. Accordingly, Clemons did not believe that it was

safe to return the children to parents who continued to test positive for illegal substances because they could not safely meet the needs of the children.

Clemons opined that he does not believe Father's unfitness was likely to change even if he was given additional time to complete the required tasks under the case plan. Clemons testified that he would like to see Father in compliance with the requirements of the case plan for at least six months before he would consider recommending placement of the children at home. Given the history of this case and the length of time the children had been in DCF custody, Clemons did not believe that granting Father an additional six months was reasonable or in the children's best interests.

Melissa Cooley—the kinship supervisor with EmberHope—also testified about her work with the family. She indicated that she met monthly with the case team as the reintegration supervisor. Considering child time, Father's lack of progress, and his continued substance abuse, Cooley testified that she supported the recommendation that Father's parental rights be terminated as to G.R.H. and S.J.H. She explained that for reintegration to occur, Father would have to demonstrate that he had the financial means to care for his children, provide a transportation plan, and address his substance abuse by successfully completing a recommended treatment program.

Cooley testified that if Father was given additional tie to complete the requirements of the case plan, he would need a new drug and alcohol evaluation because such evaluations are valid for only 60 days. Cooley also testified that the fact that EmberHope had not been provided with a copy of Father's prior drug and alcohol evaluation would not have prevented him from participating in a recommended treatment program. She explained that the evaluator would have explained the treatment recommendations to Father at the time the evaluation was completed and would have set up a treatment program with the agency or provided a referral to a different agency.

13

Cooley testified that she believed that the case team made regular, continued, and reasonable efforts to meet with Father and to provide resources for the family. She explained that if Father had been making progress on fulfilling the requirements of the case plan, he would have received more bus passes. However, Father was not consistently making progress in the case. In Cooley's opinion, Father would need a minimum of six months after successfully completing a substance abuse treatment program to demonstrate he could consistently test negative for illegal substances before the agency could recommend reintegration.

After hearing closing arguments, the district court took a recess to consider the testimony and to review the exhibits admitted into evidence. The district court then announced its decision to terminate both the mother's and Father's parental rights as to G.R.H. and S.J.H. As to Father, the district court explained that his actions did not match his words and that little had changed since the case was first initiated. The district court also found that Father had done nothing between the first and second hearing dates to show compliance with the requirements of the case plan and, instead, had "squandered that time."

Additionally, the district court found that the agency had provided a reasonable case plan with a goal toward reintegration and had made reasonable efforts in assisting Father to be successful in completing the plan's requirements. In particular, the district court viewed Father's continued drug use as demonstrating a lack of effort to adjust his circumstances, conduct, or conditions to meet the needs of his children. The district court also found clear and convincing evidence that Father was unfit and that Father's unfitness was unlikely to change in the foreseeable future.

Specifically, the district court relied on the following statutory factors in terminating Father's parental rights:

14

1. Failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family. K.S.A. 38-2269(b)(7).

2. Lack of effort on the part of the parent to adjust his circumstances, conduct, or conditions to meet the needs of the children. K.S.A. 38-2269(b)(8).

3. Failure to carry out a reasonable rehabilitation plan approved by the district court directed toward the integration of the children into a parental home. K.S.A. 38-2269(c)(3).

In addition, the district court considered child time and the fact that the case had been ongoing for nearly 18 months, which was a considerable portion of the children's lives. Lastly, in considering the physical, mental, and emotional health of the children, the district court determined that it was in the best interests of the children for Father's parental rights to be terminated.

ANALYSIS

On appeal, Father contends that the district court erred in terminating his parental rights. In doing so, he argues that the State failed in meeting its burden to establish by clear and convincing evidence that he was unfit or that his alleged unfitness was unlikely to change in the foreseeable future. Next, he contends that the district court erred in finding that the termination of his parental rights was in the children's best interests.

A parent has a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution to make decisions regarding the care, custody, and control of the parent's child. Before a parent can be deprived of the right to the care, custody, and control of the child, the parent is entitled to due process of law. But this fundamental right to parent is not without limits. *In re P.R.*, 312 Kan. 767, 778, 480 P.3d 778 (2021). Because child welfare is a matter of public concern, the State may assert

15

its interest "through state processes designed to protect children in need of care." *In re A.A.-F.*, 310 Kan. 125, 146, 444 P.3d 938 (2019).

The Revised Kansas Code for Care of Children provides that a district court may terminate parental rights only if it makes three findings: (1) The court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child; (2) the conduct or condition that makes the parent unfit is unlikely to change in the foreseeable future; and (3) terminating the parental rights is in the best interests of the child. K.S.A. 38-2269(a), (g)(1); see *In re E.L.*, 61 Kan. App. 2d 311, 322, 502 P.3d 1049 (2021). Because a parent has a fundamental liberty interest in the relationship with his or her child, the district court must make the fitness findings based on clear and convincing evidence. 61 Kan. App. 2d at 322.

On appeal, we must determine whether clear and convincing evidence supports the district court's findings that the parent is unfit. K.S.A. 38-2269(a). To do so, we determine whether the evidence, viewed in the light most favorable to the State, could have convinced a rational factfinder that these facts were highly probable. In making this determination, we do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine factual questions. *In re Adoption of Baby Girl G.*, 311 Kan. 798, 806, 466 P.3d 1207 (2020), *cert. denied* 141 S. Ct. 1464 (2021); *In re K.H.*, 56 Kan. App. 2d 1135, 1139, 444 P.3d 354 (2019). Any single factor under K.S.A. 38-2269, standing alone, may establish grounds for termination. K.S.A. 38-2269(f).

In addition, if the district court makes a finding of unfitness, the district court then must make a discretionary determination of whether the termination of parental rights is in the best interests of the child. To make this finding, the district court should consider the child's physical, mental, and emotional needs. K.S.A. 38-2269(g)(1). If a parent is

16

found unfit and "the physical, mental or emotional needs of the child would best be served by termination of parental rights, the court shall so order." K.S.A. 38-2269(g)(1).

Our review of the district court's best-interests determination is for abuse of discretion. However, if the district court makes additional factual findings that relate solely to the best-interests determination, those findings should be based on a preponderance of the evidence and further reviewed on appeal to see whether substantial competent evidence supports those findings. *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 2, 336 P.3d 903 (2014).

As far as our review involves the interpretation of statutes, our review is unlimited. *In re D.H.*, 57 Kan. App. 2d 421, 430, 453 P.3d 870 (2019).

*Finding of Unfitness*

K.S.A. 38-2269(b) provides a list of nonexclusive factors a court shall consider in determining unfitness. Kansas courts must also consider a separate list of nonexclusive factors when a child is not in the parents' physical custody, which is the case here. K.S.A. 38-2269(c). Any one of the factors set forth in K.S.A. 38-2269(b) or (c) may—but does not necessarily—establish grounds for termination of parental rights. K.S.A. 38-2269(f). In deciding whether termination is in the best interests of the child, a district court should give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 38-2269(g)(1). With these principles in mind, we turn to the merits of Father's appeal.

Under K.S.A. 38-2269(b)(7), termination is appropriate if reasonable efforts by appropriate public or private agencies failed to rehabilitate the family. Father argues that the efforts provided by the agency—in this case EmberHope—were not reasonable considering his transportation issues. Father suggests that the agency failed to meet this

need with additional support to help rehabilitate his family and integrate the children into his home. Additionally, he argues the agency failed to obtain a copy of his substance abuse evaluation from the Knox Center.

The record shows that the agency tried several different programs and approaches to help Father work toward his goals. Clemons testified that he met with Father monthly to discuss the items that needed to be addressed before reintegration could occur. Additionally, the agency provided a resource guide to Father for completing court orders, and Clemons would sit with Father and discuss the available resources.

In addressing transportation needs, Clemons testified that he provided Father with a bus pass at the beginning of the case. Clemons and Cooley both testified that the agency had a policy that limited the number of bus passes a parent could receive unless that parent was making progress on the case. Clemons explained that Father's compliance with completing court orders and submitting to the requested drug tests did not improve even when Father had a bus pass. Although the district court agreed with Father's counsel that providing him with another bus pass just days before the second day of the evidentiary hearing was useless, the court nevertheless found that reasonable efforts had been made to assist Father with reintegration when considering the totality of the agency's actions throughout the pendency of the case. We agree.

Clemons testified that he contacted the provider that performed Father's drug and alcohol evaluation at least twice to try to obtain a copy of the completed assessment. He also explained that Father could have obtained a copy of his evaluation so that he could have started treatment. In addition, Cooley testified that the evaluator would have explained the treatment recommendations to Father at the completion of the evaluation and either set up treatment with the agency or provided a referral to an outside agency. As such, the failure of EmberHope to obtain a copy of the evaluation did not affect Father's ability to start drug treatment.

18

Regarding visits with the children, Clemons explained that visits could not move into Father's home until his uncle's background check was complete. And the parents did not provide the paperwork to EmberHope until a week before the second day of the evidentiary hearing began. The record shows that Father failed to fully avail himself of all offered assistance, so he cannot now show that inadequate accommodations impeded his ability to make progress on the plan. See *In re A.P.*, No. 122,288, 2020 WL 3481474, at *7-8 (Kan. App. 2020) (unpublished opinion).

A review of the record shows that the agency met consistently with Father and discussed with him the resources available to help him meet his case plan tasks. When Father was mistaken about needing a full psychological evaluation, the agency informed him that he needed only a clinical evaluation, and it provided him with resources to obtain one. Although Father did not have access to the bus pass for the entirety of the case, this was partially because he failed to use it when he had access to it.

Although the professionals working with Father acknowledged that he had a bond with his children, Father was unable to complete the case plan tasks needed for successful rehabilitation. The agency is not required to provide "effective" efforts, but rather reasonable efforts. See *In re M.S.*, 56 Kan. App. 2d 1247, 1257-58, 447 P.3d 994 (2019). Accordingly, we find the State presented clear and convincing evidence that Father was unfit under K.S.A. 38-2269(b)(7).

Next, under K.S.A. 38-2269(b)(8), termination is appropriate if Father showed a lack of effort to adjust his circumstances, conduct, or conditions to meet the needs of the children. Father argues that he demonstrated "substantial compliance and meaningful adjustments" to meet the needs of his children. He notes he maintained a stable home with utilities on and bills paid; he cleaned his home and maintained cleanliness; he completed case plan tasks such as several courses that he was ordered to complete; he

19

maintained visits with his children; and he "was ready to enter inpatient treatment immediately."

The record shows that Father failed to adjust his circumstances, conduct, or conditions to meet the needs of his children in several significant ways. Most significantly, Father failed to maintain his sobriety. Father admitted to using methamphetamine and cocaine. We note that a parent actively abusing illegal drugs is also trafficking in those drugs to obtain them. This course of conduct exposes the parent to potential arrest and prosecution for drug-related felonies. If an arrest were to occur, Father would be unable to provide a safe, stable home environment for his children.

Father acknowledged that he missed the majority of the requested drug tests and claimed this was because he did not have transportation. Although it appeared that he could help Mother obtain her driver's license, Father failed to help her do so because he was overwhelmed. He testified that he understood that, based on his history of substance use and his failure to complete drug testing, he was required to complete a drug and alcohol evaluation. However, he missed an appointment to obtain one after he failed to wake up on time.

On the first day of the evidentiary hearing held on September 24, 2024, Father testified that he would enter inpatient treatment that week if that was what the district court wanted him to do. However, he did not have an inpatient bed lined up. He asked the court to give him one more month to achieve sobriety. Then, on the second day of the hearing—which was held nearly two months later—Father admitted that he had been discharged from a substance abuse treatment provider for inconsistent attendance. Furthermore, Father tested positive for illegal drugs on both days of the hearing.

Father recognized that the best way to ensure his children's safety was to work on his sobriety. He stated he should have been sober by the hearing date, but he "failed

20

miserably" and acknowledged that he did not work to achieve sobriety. Clemons testified that the need for drug treatment was discussed with Father. Father acknowledged that he understood the concern of placing children in a home where substance abuse occurs. Yet, despite this acknowledgement, he tested positive for illegal substances on both days of the evidentiary hearing.

Father failed to address his substance abuse issues despite knowing and understanding that it was a major factor in the reason his children remained in DCF custody. He made excuses regarding transportation, but he also did not make efforts to find a way to successfully attend drug treatment and address his sobriety. He testified that he rode his bike to a second provider on two occasions and was informed that their walk-in program was full each time. But he did not try a third time or get there earlier to ensure that he would be able to participate. The record confirms clear and convincing evidence that Father had not changed his circumstances, conduct, or conditions to meet the needs of his children under K.S.A. 38-2269(b)(8).

Moreover, the district court also found termination was appropriate under K.S.A. 38-2269(c)(3), which applies if the State shows the parent failed to carry out a reasonable plan approved by the district court directed at integration of the child into the parental home. However, as discussed in *In re Y.B.*, No. 126,233, 2024 WL 1358031, at *6, 8 (Kan. App. 2024) (unpublished opinion), members of this court disagreed on whether K.S.A. 38-2269(c)(3) applies when the State has not shown that the children have been in out-of-home placement for 15 of the most recent 22 months, counting from 60 days after the removal of the children from the home, as required under K.S.A. 38-2269(b)(9).

Here, we find the State presented clear and convincing evidence that Father was unfit under K.S.A. 38-2269(b)(7) and (b)(8). As such, we see no reason to weigh in on the dispute over K.S.A. 38-2269(c)(3) under the circumstances presented in this case.

21

*Likelihood to Change in the Foreseeable Future*

Once a district court finds a parent unfit, the State must prove by clear and convincing evidence that the conduct or condition rendering the parent unfit is unlikely to change in the foreseeable future. K.S.A. 38-2269(a). Although Father argues that he has achieved most of the tasks on his case plan, the record reflects that he has made little—if any—progress in remaining drug free. Father admitted to using illegal drugs just a few days prior to the last day of the evidentiary hearing and he tested positive for drugs on both days of the evidentiary hearing.

When asked at the evidentiary hearing to provide a timeline to achieve sobriety, Father was unable to do so. Clemons said that Father would have to go through drug treatment and maintain his sobriety for at least six months before the children could return home. We find the State has presented sufficient evidence to support the district court's finding that Father was unfit and that his unfitness was unlikely to change in the foreseeable future.

There is no set amount of time that constitutes the "foreseeable future." Kansas measures this time "from the child's perspective, not the parent['s], as time perception of a child differs from that of an adult." *In re S.D.*, 41 Kan. App. 2d 780, Syl. ¶ 9, 204 P.3d 1182 (2009); see K.S.A. 38-2201(b)(4); *In re R.S.*, 50 Kan. App. 2d at 1117. We have considered periods of time as short as several months as too long to be the foreseeable future from a child's perspective. *In re S.D.*, 41 Kan. App. 2d at 790. Children have the right to permanency in a time frame reasonable to them. See *In re E.L.*, 61 Kan. App. 2d at 329. In making this determination, the court may look to the parent's past conduct as indicative of future behavior. 61 Kan. App. 2d at 328.

The children were placed in DCF's custody in May 2023, and they remained out of the home throughout the case and at the time of the final termination hearing on

22

November 20, 2024. Even if Father went through drug treatment immediately, the agency noted that it needs to see at least six months of sobriety before the children could return home. "[A] child deserves to have some final resolution within a time frame that is appropriate from that child's sense of time." *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008). Children and adults have different perceptions of time and acknowledgement of child time supports the children's right to permanence within a reasonable timeframe. *In re M.S.*, 56 Kan. App. 2d at 1263.

Although we appreciate Father's desire to be reintegrated with his children, he has unfortunately been unable to make measurable progress to becoming a fit parent during the pendency of the case. His past conduct is relevant to the district court's finding that he was unlikely to change his circumstances in the foreseeable future. Viewing the evidence in a light most favorable to the State, we find clear and convincing evidence to support the district court's findings that Father's unfitness was unlikely to change in the foreseeable future.

*Best interests of the child*

Father also challenges the district court's finding that termination was in the best interests of the children. Once the district court finds that a parent is unfit and unlikely to change in the foreseeable future, it must determine whether termination of parental rights is in the best interests of the children involved by a preponderance of the evidence. *In re R.S.*, 50 Kan. App. 2d at 1116; see K.S.A. 38-2269(g)(1). The statute provides that in making that determination, the court shall give primary consideration to the physical, mental, and emotional health of the child. K.S.A. 38-2269(g)(1).

The determination of the best interests of the child is entrusted to the district court's sound judicial discretion. As such, our review of this determination is for an abuse of discretion. *In re M.S.*, 56 Kan. App. 2d at 1264; *In re R.S.*, 50 Kan. App. 2d 1105, Syl.

23

¶ 2. A district court abuses its discretion if it bases its decision on an error of fact or law or if no reasonable person would agree with its decision. *In re P.J.*, 56 Kan. App. 2d 461, 465-66, 430 P.3d 988 (2018). Father, as the party asserting the district court abused its discretion, has the burden of establishing such abuse. *In re K.E.*, 294 Kan. 17, 23, 272 P.3d 28 (2012).

Father argues that the weight of the evidence does not support the finding that termination is in the children's best interests, and the court failed to "give proper, individualized consideration to the emotional and psychological relationship between Father and his children." He noted that the September 12, 2024 case report commended Father for maintaining visitation and noted the children appeared bonded to him, which weighs against severing the parent-child relationship.

Courts should consider the relationship between the parent and child and the trauma that may be caused by termination. *In re K.R.*, 43 Kan. App. 2d 891, 904, 233 P.3d 746 (2010). But it also must consider any detriment to the physical, mental, or emotional health of a child if the parental rights are not terminated, as well as the benefits of permanency. See K.S.A. 38-2269(g)(1); 43 Kan. App. 2d at 904.

Here, the district court was in the best position to determine the best interests of the children, and Father failed to demonstrate that the district court based its decision on an error of law or fact or that its decision was so unreasonable that no one would agree with it. Father contends that the State's decision to seek termination only with respect to the two youngest children undermines the determination regarding the children's best interests. However, as demonstrated by a review of the record, the State sought termination of the four children that were in DCF custody. The district court granted a continuance as to the older children based on the guardian ad litem stating that he could not make a determination whether termination would be in their best interests because their whereabouts were unknown for most of the case.

24

Considering the evidence in the record, we conclude that the district court did not abuse its discretion in finding that termination of parental rights was in the children's best interests. Father had made no progress toward drug treatment or sobriety, and Clemons and Cooley both testified that it would be at least six months after drug treatment before integration into the home could be considered.

We also note that one of the children, G.R.H., was diagnosed with autism and would require a high standard of care, with appointments for medication management and speech therapy. Clemons testified that Father had not given the agency verifiable income information, and the case team did not know if Father would be able to get the children to their necessary appointments. Clemons noted that Father had not completed his own mental health evaluation, and it was unclear if he could meet that child's level of care.

In a case report, Clemons noted that Father had not demonstrated that he was able to meet the physical, mental, and emotional needs of his children. He reported that children who have a prolonged timeframe for achieving permanency were unable to gain a sense of stability which was vital to their well-being. Over time, this lack of stability could lead to delays in development, issues at school, and other problems. For that reason, it was important for the children to see permanency as quickly as possible.

We find a rational factfinder could have found that delaying permanency would not be in the children's best interests in this case. Given the history of the case and the amount of time the children had been in custody, granting Father six more months was not in the children's best interests. Accordingly, we conclude that Father has failed to demonstrate that the district court abused its discretion in determining that termination was in their best interests.

CONCLUSION

In summary, viewed in the light most favorable to the prevailing party—in this case the State—we find clear and convincing evidence to support the district court's finding that Father was unfit, and that the conduct or condition rendering Father unfit to care for the children was unlikely to change in the foreseeable future. In addition, Father does not show that the district court abused its discretion in ruling that termination of Father's parental rights was in the children's best interests. We therefore affirm the district court's order terminating Father's parental rights.

Affirmed.